## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CHERYL RENEE SAID | ) | |
| 3927 Pennsylvania Avenue | ) | |
| Apartment # 102 | ) | |
| Washington, D.C. 20020 | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No: _____ |
| | ) | |
| | ) | |
| THE NATIONAL RAILROAD PASSENGER | ) | |
| CORPORATION (a District of Columbia corp.) | ) | |
| 60 Massachusetts Ave NE | ) | |
| Washington, D.C. 20002 | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

_____)

## COMPLAINT

Comes now Plaintiff Cheryl Renee Said ("Mrs. Said or Plaintiff"), a black African

American woman, by and through her Counsel, Stephen Christopher Swift, of Swift &

Swift, Attorneys at Law, P.L.L.C., and alleges against the National Railroad Passenger

Corporation ("AMTRAK"), and its agents, Paul Ryan, Kathy Brewer, and Phillis

McClinton ("Defendant") as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over all claims for relief, including state claims, pursuant

to 28 U.S.C. § 1331, and 28 U.S.C. § 1367, supplemental and ancillary jurisdiction.

2.   Venue is proper because Defendant's actions occurred in the District of Columbia,

Defendant conducts business in the District of Columbia, and has its Corporate

Headquarters and Principal Office in the District of Columbia.


## CAUSE OF ACTION

3.   This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e, et seq.; Section 1981 42 U.S.C. §§ 1981-1988; Section 1983 42 U.S.C. § 1983;

D.C. Human Rights Code 1-2511 et seq.; Wrongful Discharge in violation of D.C.

Public Policy; Fraudulent Misrepresentation and Negligent Misrepresentation in

violation of the District of Columbia laws. Plaintiff brings this action to redress

Defendant's wrongful termination of her employment with it.


4.   Plaintiff has exhausted her administrative remedies. EEOC Dismissal and Notice of

Right to Sue was issued on May 4, 2015 pursuant to 29 C.P.R. 1601.28 (a) by Mindy E.

Weinstein, Acting Director, U.S. Equal Opportunity Employment Commission,

Washington, D.C. Field Office, 131 M Street, N.E., Suite 4NW02F, Washington D.C.

20507**. (See attached Exhibit A).** Plaintiff received notice on or about May 13, 2015

(Plaintiff had moved from prior address. Her niece notified Plaintiff by phone of the

letter on or about May 13, 2015. Plaintiff picked up the letter the same day.)


## THE PARTIES

5.   Plaintiff Cheryl Said**,** an individual, was employed by AMTRAK as a Lead Service

Attendant. She is now a resident of the District of Columbia and lives at the address

provided in the caption hereof. Plaintiff was also a resident of the District of Columbia

while working for Amtrak until two weeks after her husband's death, when Plaintiff

moved to Maryland. At the time Defendants terminated Mrs. Said's employment, which necessitated this Complaint, Plaintiff was 54 years old, and resided at, 1119 Ivy Club Lane, Landover, MD 20785. Mrs. Said, during her employment with Defendants, was a Union member of Amtrak Service Workers Council ("ASWC") and was covered by the Collective Bargaining Agreement ("CBA") between AMTRAK and ASWC.

6.   Defendant Amtrak is a Corporation of the District of Columbia, with its Principal Office and Corporate Headquarters, at 60 Massachusetts Avenue N.E., Washington, D.C. 20002. Mr. Ryan, Ms. Brewer, and Ms. McClinton at relevant times, were all senior officers of AMTRAK. At all relevant times to this complaint and prior to his retirement, Mr. Philip Ryan was AMTRAK's Manager, for the Washington D.C. Crew Base. At all relevant times to this complaint and prior to her transfer to AMTRAK office in Chicago, Ms. Kathy Brewer was AMTRAK's Washington D.C. Crew Base Assistant Superintendent. At all relevant times to this complaint Ms. Phillis McClinton was AMTRAK's Operations Manager, and Plaintiff's manager and direct supervisor at all time and up to the time of her termination. Ms. McClinton is still Defendant's manager, at the Washington D.C. Crew Base. Mr. Ryan, Ms. Brewer, and Ms. McClinton during the relevant times to this complaint, were and acted as agents of AMTRAK. Ms. McClinton worked directly under the direction of Mr. Philip Ryan.

7.   On-Board Services Operations Manager Phyllis McClinton was Complainant's manager and direct supervisor. While Ms. McClinton was on medical leave of absence between on or about July 2011 and January 2012, On-Board Services Managers, Patricia Baylor and Cheryl Tyler and Assistant Superintendent Kathy Brewer handled Ms. McClinton's supervisory responsibilities.

8.   AMTRAK is an "employer" pursuant to 42 U.S.C. § 2000e, and D.C. Code 1-2502 and was so situated during all times pertinent herein.


## STATEMENT OF FACTS

9.   On or about February 1, 2011, while on duty working for Defendant, in Boston, her neighbors, called to inform her that her husband had died. Mrs. Said, was devastated. Her husband suddenly suffered massive heart attack, neighbors called ambulance and shortly after, he died in hospital. Because of inclement weather, Mrs. Said, could not return to home, until the next day.

10.   When she returned the next day from Boston, her colleagues were at the Union Station, D.C. to welcome her and sympathized with her.

11.   Mrs. Said, was given time off due to the death of her husband. Her husband died very suddenly on 02/01/2011 and she was given time off to bury him.

12.   Under the terms of the Collective Bargaining Agreement ("CBA") (which covered Plaintiff, as a Lead Service Attendant), Plaintiff was entitled to three (3) days of bereavement leave.

13.   Plaintiff received three (3) days bereavement leave. She was contacted by Ms. Phyllis McClinton who recorded the leave.

14.   Mrs. Said's husband's sudden death had a devastating effect on her. She became very ill as she suffered prolonged grief, severe depression, anxiety and insomnia coupled with the high blood pressure she already suffered from. Mrs. Said needed and requested

additional time off, which was granted. Later in February, still ill and not coping well at

with her loss, Plaintiff informed her supervisor Ms. Phyllis McClinton, that she was still

ill and unable to return to work and requested additional leave. On March 26, 2011,

Respondent granted another personal leave of absence with an "Estimated Return from

LOA Date 4/30/11." This was the third leave of absence Ms. Said requested for and was

granted by her supervisors, Ms. McClinton, Kathy Brewer, and Defendant's human

resource personnel because she was still very ill. Two of the approved leave of absence

sheets clearly have "estimated return" dates. One had no stated estimated return dates.

**(See attached Exhibit B1-3).**

15.   Unfortunately, for Mrs. Said, she did not get better by April 30, 2011. She had no

health insurance because she was covered under her husband's employer's health

insurance plan, and when her husband died, that coverage ended. She had no coverage

under Amtrak health insurance; hence she was unable to get the medical care she

needed. Prior to April 30, 2011, Mrs. Said, called her supervisor Ms. Phillis McClinton

and informed her that she still very ill and unable to return to work at the end of April

2011. She verbally requested another leave of absence over the phone, and Ms.

McClinton granted her request, and gave her permission to **"take all the time you need

to get better before returning to work."** When Ms. McClinton, assured Plaintiff that

she need not worry about being absent for long, i.e, that she could take as much time as

she needed to get well, she believed that as her supervisor, she had the authority to give

her that verbal permission, without any need for her to fill any paper work, as Ms.

McClinton never raised the issue. She never thought that she did not have such authority.

She relied on that assurance. As it turned out Ms. McClinton had no such authority, and

she was terminated for not documenting that permission.

16.   Mrs. Said, had a total breakdown as a result of suddenly losing her husband of over 20 years. There was no question whatsoever about that, and the fact that all who knew her and saw her, including her supervisors, knew that she was seriously ill and was not in any shape whatsoever, to return to work until she gets well. And her doctor's reports also stated that she was not fit to return to work.

17.   Because Mrs. Said's health insurance from her husband ran out, in April, 2011, her Supervisor, Ms. McClinton, attempted to assist Plaintiff to see if she could get Plaintiff health insurance coverage with Amtrak. However, Amtrak said it could not cover Plaintiff, so Ms. McClinton's efforts failed.

18.   While Supervisor Ms. McClinton was on medical leave, On-Board Services Manager Baylor contacted the Medical Department to see if Mrs. Said had been granted medical leave, because she had been absent for several months.

19.   Through all the different time that Mrs. Said requested leave of absence, including when Ms. McClinton gave Mrs. Said, verbal permission for another extended leave of absence, and to "take all the time you need to get better before returning to work", none of her superiors she discussed her situation with, ever discussed filling of a medical leave form with Plaintiff. Mrs. Said did not file any written form for medical leave because no one informed her that she must do so. No one gave her a medical leave form or directed her to go get one or where to get one. All her supervisors whom she discussed her health issues with, and who gave her permission to take all the time she needed off, knew that

she had not filed any "medical leave form." They never discussed filling one with her even though she was in contact with them and they were in contact with her regularly, during the relevant periods.

20.   Two weeks after Mrs. Said's husband's death, she moved from the home she had lived with her husband in D.C., to another address in Maryland. As soon as she moved, she notified her AMTRAK. She also notified her direct manager Ms. McClinton, who will later send her a condolence card at her new address. AMTRAK also had Plaintiff's telephone contact number in its files – although her address changed, her telephone number (202-422-2728), which Defendants had in their files, did not, until 2012.

21.   In early April 2011, sick and broke, Plaintiff called Security Mutual Life Insurance Company ("Security Mutual Life") to inquire if she had any collectable life insurance from Amtrak. Based on her inquiry, Security Mutual Life sent inquiries about Ms. Said to Defendant Amtrak, via their Washington Crew Base, Manager, Mr. Philip R. Ryan. On April 15, 2011, Mr. Ryan wrote to Security Mutual Lire to confirm that Mrs. Said met the requirements for receiving benefits under Amtrak's life insurance policy. Among other things, Mr. Ryan stated in his letter: "This requirement meets and exceeds any 17 1/2 requirement per your letter." **(See attached Exhibit C).**

22.   Before sending his above mentioned letter to Security Mutual Life, a few days earlier, Mr. Ryan called Plaintiff on the phone on (202) 422-2728, at her new home.

During that call, Mr. Ryan asked Plaintiff how she was doing and Plaintiff told him "I am not doing well", to which Mr. Ryan responded: "you take all the time you need and get well." Mr. Ryan then told Plaintiff that Security Mutual Life had contacted him for some personal employment information about Plaintiff, and that he was calling to ask for her permission before he forwards them to Security Mutual Life. Plaintiff gave Mr. Ryan her consent, hence, Mr. Ryan's letter to Security Mutual Life, dated April, 15, 2011.

23.   After receiving Mr. Ryan's letter, Security Mutual Life agreed with Mr. Ryan's letter that Mrs. Said, met Security Mutual Life's requirements and approved Plaintiff's application. And on May 26, 2011, Security Mutual Life, sent Plaintiff a second check, after an earlier check they sent Plaintiff apparently was lost in transit. **(See attached Exhibit D).**

24.   Sometime in June 2011, Plaintiff met Ms. Kathy Brewer at the Giant Food store in Largo, Maryland. Seeing how ill she was, said to Plaintiff: "Cheryl, you don't look good at all." Plaintiff explained how ill, and financially broke she was. Ms. Brewer advised Plaintiff to contact the Railroad Retirement Board ("RRB") to see if she can get sickness disability benefits form Amtrak. Also, Ms. Brewer advised Plaintiff not to worry, but to "take all the time she needed to get well before returning to work."

25.   After Mrs. Said's husband's death, she suffered, prolonged grief, deep depression, anxiety and insomnia, in addition to her having high blood pressure. She was on

medication and on her doctor's orders, was not to return to work, until she got well. She was also broke.

26.   The RRB, is responsible for administering Amtrak's retirement and sickness benefits. Mrs. Said, took Ms. Brewer's advice and contacted the Railroad Retirement Board and applied for sickness benefits. The RRB, paid sickness benefit to Mrs. Said, from August 2011, until March 2012, with Amtrak's approval. **(See attached Exhibit E).**

27.   At all times during the period when Plaintiff was ill and collecting disability benefits, Defendants knew she was not working because she was on medical leave, which her superiors verbally gave her permission for. They knew that she was collecting sickness benefit because each claim Mrs. Said made to the RRB, would first be sent to Amtrak, and will only be paid to Mrs. Said, after Amtrak's approval was received. Because, the RRB is required by law to notify the employer whenever an employee files a claim for benefits it disburses, including and not limited to sickness benefits and unemployment benefits. **(See attached Exhibit F).**

28.   Defendant also knew that Plaintiff was out of work since her husband's death. Defendants also knew that the reason she was not back to work was because she was seriously ill. Amtrak knew she was ill because Plaintiff's doctor had to certify that she was ill and unable to work before she could collect any sickness benefits. Plaintiff's

doctor, who Mrs. Said was under his care, certified that Plaintiff was ill and unable to work for the periods she collected sickness benefits. **(See attached Exhibit G).** Without this certification from Plaintiff's doctor, RRB will not give Mrs. Said any sickness benefit.

29.    Despite Amtrak and its managers and supervisors' full knowledge of Mrs. Said's whereabouts and the reason for her absence from work for a long period of time, they claimed that they did not know. Despite her very regular contact with her supervisors and other colleagues, and despite Defendants approval for sickness benefit for Plaintiff from August 2011, to March, 2012, on November 4, 2011, Defendant through its agent Philip Ryan, terminated Mrs. Said's employment with them. **(See attached Exhibit H).** Defendant claimed it terminated Plaintiff pursuant to "Rule 24" of their CBA. Rule 24 of then controlling CBA states:

> "Rule 24 - Unauthorized Absence" "Employees who are absent from work for ten (10) days without notifying the corporation shall be considered as having resigned from the service, unless the corporation is furnished satisfactory evidence that circumstances beyond their control prevented such notification."

30.    Defendant and its agents, terminated Mrs. Said on the basis of Rule 24 that applies or should be applied against an employee who has been absent from work for ten days without notifying the "corporation…" However, Plaintiff was not terminated after 10 days of absence but after about a year's absence. Plaintiff was out of work from February 2, 2011 to February 9, 2012, when she reported to work to inform her employer that she was officially returning to work on her doctor's orders, on February 19, 2012. This

period includes requested and documented approved periods of leave of absence and

verbal approved leave of absence by Mrs. Said's supervisors and managers as stated

herein above.

31.   The same managers and supervisors, who saw, and directly spoke to Mrs. Said, who

knew that she was seriously ill, and gave her permission to take all the time she needed,

turned back and claimed Plaintiff did not notify them, and they did not know of her

absence or reason for it. Ms. McClinton sent Plaintiff a condolence card to her new

address, when she moved from the address Defendants sent their termination notice and

letter to. Although Ms. McClinton was on leave apparently at the time Plaintiff was

terminated, no one it seems, contacted her to ask for Plaintiff's contact. And Ms.

McClinton on her return, never bothered to contact Plaintiff until Plaintiff showed up on

February 9, 2012.

32.   When Mrs. Said, returned to work on February, 2012, she met Ms. McClinton, her

direct manager. She told her that she was there to notify them that she would be returning

to work on February 19, 2012 on her doctor's orders. It was then Ms. McClinton

informed her that she should go meet Mr. Ryan. When Mrs. Said asked why she had to

meet with Mrs. Ryan, Ms. McClinton told her just to meet with him and that Mr. Ryan

will talk to her. Plaintiff met with Mr. Ryan, and it was then, that she was told by Mr.

Ryan, that she had been terminated back in November, 2011.

33.   In the termination letter, Defendant stated that it sent an earlier letter to Mrs. Said,

on October 10, 2011. Both the claimed October letter and the actual termination later

dated November 4, 2011, was sent to Mrs. Said's old address that she moved out from, two weeks after her husband's death in February, 2011. Mrs. Said, never received any of those letters, and so did not know that she had been terminated until she showed up at work on February 9, 2012 to report that she will be returning to work on February 19, 2012. A copy of the claimed October 10, 2011 sent earlier to Mrs. Said, before the November 4, letter, was never given to Mrs. Said, and it was not in her personnel file that Defendant gave her on her request.

34.   Mrs. Said, never received any of the letters sent by Mr. Ryan, including the termination later, because Defendant, knowingly sent them to her old address because they did not intend the letters to reach her – they just wanted a way to terminate her employment and they felt Rule 24 provided them an avenue for that. Mrs. Said, never, expressed or implied to anyone, that she was not going to return or that she intended or wanted to resign her employment. She informed her employer of her condition and her whereabouts. When she moved, she gave Defendant her new address. Her telephone number, the one Mr. Ryan, called her on, in April 2011 (which Defendant had in their file), was still the same at the time Mr. Ryan claimed in his letter that they could not reach her.

35.   The RRB, Mutual Life Insurance, all had Mrs. Said's correct address and telephone number, but Mr. Ryan, Ms. Brewer, Ms. Baylor, and others he copied on his letter, claim they did not have her correct contact that they could have given her an effective notice of their impending action against her, even though RRB has been sending Plaintiff's sickness benefit claim requests and her doctor's supplemental statements, to Amtrak for approval before paying her, and Amtrak has been approving Mrs. Said's sickness benefit

from August, 2011 to March 2012 - past Defendant's claimed termination date. Again, **(see attached Exhibit E).**

36.   Several employees (Keisha Shaw, Latoya, Fred, Nicole) of Defendant had visited Plaintiff at her new address. Plaintiff also faxed a letter to Wilmington, Delaware Human Resources and gave them her new address. That Mr. Ryan and his colleagues who terminated Plaintiff did not know her correct address or her contact number is not true. Mr. Ryan and his colleagues knew where and how to reach Plaintiff, but failed to address mail correctly to her, because they wanted to terminate Mrs. Said because of her race and sex, and because , in their estimation, she has been ill for long and they did not want her back.

37.   Mrs. Said was in regular contact with all relevant personnel, including Mr. Ryan and her other supervisors, and they all were aware that she was ill and that was the reason she was not at work. On the contrary, Mrs. Said was ill, and trying her best to get well before returning to work. She was so devastated after her husband's death and her health seriously deteriorated for many months before she was well enough to get back to work, on her doctor's orders. She never abandoned her work, and she never resigned her employment.

38.   Mrs. Said was absent from work due to ill health from February 2, 2011, when her husband suddenly died, to February 9, 2012, when she reported to work to ask if human resources (HR) needed her to fill any paperwork for her return. Plaintiff's doctor had certified to the RRB that Plaintiff's "estimated return-to-work date would be 2-19-12. Plaintiff's doctor also gave her certification that she was able to return to work on February 19, 2012. **(See attached Exhibit I).**

39.   Plaintiff believes that Mr. Ryan, who had attempted a little while prior to her husband's death to fire her, finally found an opportunity to do so, because he hated her, because she was an African American woman, and because, she was ill, disabled by her illness and unable to carry out her work duties, due to her illness.

40.   A few months before Plaintiff's husband died, with intent to discipline Plaintiff and find a reason to fire her, Mr. Phil Ryan had called Ms. Said, into his office, with her supervisor present, and had told Mrs. Said that he was going to discipline her because he found that she was not on duty at her post. Plaintiff told Mr. Ryan that he must be mistaken, because she was at all times at her post on duty. Mr. Ryan insisted that he saw Plaintiff. Plaintiff denied it and called her co-worker who had seen her and knew that she was on her post at the time Mr. Ryan claimed, to corroborate her statement. That colleague, was Mr. Lee Lockhart "(Mr. Lockhart), another Amtrak employee, who later gave his sworn affidavit in support of Plaintiff's claim, during the EEOC investigation stage. **(See attached Exhibit J).** When Mr. Lockhart came into Mr. Ryan's office with Plaintiff and her supervisor and Mr. Ryan present, Mr. Lockhart told Mr. Ryan that he must have been mistaken because he saw Plaintiff doing her job. To this Mr. Ryan commented: **"well I thought it was you, because YOU ALL LOOK ALIKE",** meaning that all black women look alike. But for Lee Lockhart, Mr. Ryan would have erroneously wrongly found something to use against Plaintiff so as to terminate her employment.

41.   It was known at Amtrak, that Mr. Ryan did not like Black women. Mr. Ryan has his reason for hating black women in general. Mr. Ryan's son had been incarcerated for murdering his own daughter, who he had with a black woman. Mr. Ryan had been heard

saying that "but for the black woman his son got mixed up with, he would not have been imprisoned." Mr. Ryan is understandably angry that his son is convicted of murder and imprisoned for that. But he has no right to discriminate against and or punish Plaintiff just because she is a black woman. Plaintiff believes that her termination by Mr. Ryan, who well knew her circumstances and had spoken to her, based on Rule 24 of their CBA, was just an excuse.

42.   Defendant has no business reason(s) whatsoever, for terminating Mrs. Said. When they terminated her, her position was not eliminated. Mrs. Said did not hold an "executive" or "essential" position, and as such, her absence did not impact on Defendants' running of its daily business. On their official separation documents, Defendants noted that Plaintiff's position would still be kept - in other words, not eliminated. The separation document also noted that Plaintiff was "not eligible for rehire." **(See attached Exhibit K).**   The "not eligible for rehire" classification of Plaintiff, in her separation document, goes to show the extent of Mr. Ryan's animus towards Mrs. Said. He not only intentionally terminated her existing employment with Amtrak, but ensured that she never, ever, works for Amtrak again, all behind the claimed pretext that Mrs. Said, did not notify Defendants of her whereabouts and the reason for her absence from work, when in fact, Mr. Ryan and Amtrak and other Amtrak employees, knew quite well that she had been absent from work for more than 10 days, and did nothing about it. They also knew very well, the reason for Mrs. Said's absence.

## COUNT I
### Plaintiff claims and alleges that Defendants violated her Civil Rights pursuant to Title VII of the Civil Rights Act of 1964 42 U.S.C. §§ 2000e, et seq.

43.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 42

above as though fully set forth herein.

44.   Plaintiff believes that Amtrak and its agents terminated her on the basis of her

race and sex – Black Woman. Plaintiff believes that if she was not a black woman,

Mr. Ryan would not have terminated her, because he knew the reason for her

absence. Mr. Ryan had no other legitimate reason for terminating Mrs. Said, but for

his animus against her, based on her race and sex. Plaintiff alleges that Mr. Ryan,

hated her and had all the time had been looking for an opportunity to terminate her,

and finding none, used Rule 24 of their CBA as a pretext.

42 U.S. Code § 2000e–2 states:

> (a)   Employer practices
>
> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. Title VII prohibits Discrimination, Harassment, Retaliation and conduct that creates a hostile work environment, on the basis of race, color, sex/gender and disability.

45.   Plaintiff is a Black African American Woman. She was terminated because of

her race and sex – Black African Woman. Although Mr. Ryan claimed it was based

on Rule 24, which was not the reason but a pretext – a reason given to cover up the

real reason and motive behind his termination of Plaintiff in the circumstances of the

facts as narrated herein above. Mr. Ryan spoke with Mrs. Said in April 2011. During

that conversation, he asked her how she was doing. She informed him that she was not doing well, because she was ill. He told her to take all the time she needed to get well before returning back to work. Later, with no attempt to reach her at the same telephone number he used to call her in April, which was still operative at the time, and ask her why she was not back to work, he terminated her. Mr. Ryan sent his notice of termination and the termination letter to Plaintiff's old address, knowing fully well that mail will never reach her, because she had moved from that address. And Amtrak had her new address on file. Plaintiff claims Mr. Ryan had it in for her, and that her termination was orchestrated in the way it was done, to ensure that she never knows on time that she had been terminated, and have the opportunity to fight back to get her job back.

46.   Because of Defendant's actions, Mrs. Said, lost her job and livelihood at age 54, when it became extremely difficult for her to obtain meaningful employment. To-date, she does not have a steady job. Because of Defendants actions, Plaintiff became homeless and for a while had to sleep in her car, because she could not afford to pay for a room, let alone an apartment of her own. As a result of Defendant's actions, Plaintiff had suffered emotional distress, humiliation, and had been deprived of her rights and privileges as an Amtrak employee, on the basis of her race and sex in violation of as42 U.S. Code § 2000e et. seq.

47.   Defendant is an employer as defined under 42 U.S. Code § 2000e (b).

## COUNT II

### Plaintiff claims and alleges that Defendants violated her
### Civil Rights pursuant to Section 1981, 42 U.S.C. §§ 1981-1988.

48.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 47

above as though fully set forth herein.

49.   Plaintiff believes that Amtrak and its agents terminated her on the basis of her

race and race – African American. Plaintiff believes that her termination is a

race-based constructive discharge because Defendant claims that her termination was

pursuant to Rule 24 of their CBA, which means that under that under the rule,

Plaintiff, herself, constructively resigned. Plaintiff never intended to or wanted to

resign her employment, and in fact, never resigned her employment. Based on its

agent's animus against African American women, who was intent on terminating

Plaintiff, and finding no legitimate reason to do so, he hid behind Rule 24 to

accomplish his invidious racism against Plaintiff.

50.   Mr. Ryan's actions were intentional and unlawful. Mr. Ryan had no basis for

terminating Mrs. Said, but for his cloaked animus towards her, because Mrs. Said, in

his mind, mirrors the African American woman who caused his Caucasian son to be

imprisoned. And the only way to get to Mrs. Said, as a revenge, for what an African

American woman "did to his son", was to terminated Plaintiff even though Plaintiff

had nothing to do with his son's predicament. Mr. Ryan, hated Plaintiff, and had,

during Plaintiff's employment at Amtrak, been looking for an opportunity to

terminate her, and finding none, used Rule 24 of their CBA as a pretext to carry out

his goal.

Section 1981, 42 U.S. Code § 1981 states:

(a)   Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)   "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

51.   Being able to take leave of absence off work and duties, during bereavement, to mourn her husband who suddenly passed away after 20 years of marriage, is part of the enjoyment, benefit, privilege and condition of employment. Being able to take time off when ill and unable to work so as to get medical treatment and get well and return to work, is part of the enjoyment, benefit, privilege and condition of employment. Being able to take time off work and duties, when ill or sick and unable to work, while collecting sickness benefit, during that period of disability, because has no other means to earn a living, is also part of the enjoyment, benefit, privilege and condition of employment.

52.   By terminating her because she took leave of absence to mourn her husband and to recuperate from the devastation, and prolonged illness that she suffered as a result, Plaintiff claims was unlawful and a punishment for enjoying the benefits and privileges of her employment with Amtrak in violation of Section 1981.

53.   Plaintiff claims that the use of Rule 24 of the CBA to terminate her by Mr. Ryan, was a pretext. Mr. Ryan knew he had no legal right to terminate Mrs. Said, yet he

intentionally and willfully did terminate her. Plaintiff also believes and claims that were she not an African American, she would not have been terminated in the circumstances she was, by Mr. Ryan, a Caucasian male and agent of Defendant Amtrak. Because she was targeted by Mr. Ryan, even before her husband died, based on her race.

54.   Plaintiff's race is African American. Amtrak is an employer for purposes of 42 U.S. Code § 1981. Pursuant to Section 1981, Plaintiff has the same right to enjoy the benefits and privileges of her employment as Mr. Ryan and other races. Mr. Ryan intentionally and unlawfully denied Mrs. Said that right, in violation of the Act, when he, without any justification whatsoever, surreptitiously terminated Mrs. Said's employment with Amtrak.

## COUNT III
### Plaintiff claims and alleges that Defendants violated her Civil Rights
### Pursuant to the District of Columbia Human Rights Code 1-2501 et seq.

55.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 54 above as though fully set forth herein.

56.   Plaintiff believes that Amtrak and its agents terminated her on the basis of her race, sex and disability. Plaintiff is a Black African American Woman. Plaintiff alleges that Mr. Ryan, hated her and for a reasonable time had been looking for an opportunity to terminate her, and finding none, used Rule 24 of their CBA as a pretext.

D.C. Code § 1-2512. Unlawful discriminatory practices in employment – states:

(a) General. It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, or political affiliation of any individual:

(1) By an employer. To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee;

57.   Mrs. Said is a Black African American Woman. She was terminated because of her race, sex and disability. Although Mr. Ryan claimed it was based on Rule 24, of the CBA, that was a pretext – a reason given to cover up the real reason and motive behind his termination of Plaintiff in the circumstances, and facts as narrated herein above.

58.   Mr. Ryan spoke with Mrs. Said in April 2011. During that conversation, he asked her how she was doing. She informed him that she was not doing well, because she was ill. He told her to take all the time she needed to get well before returning back to work. Later, with no attempt to contact Plaintiff, at the same telephone number he used to call her in April, (which was still operative at the time), and ask her why she was not back to work assuming he did not actually know, he terminated her.

59.   Mr. Ryan sent his notice of termination and the termination letter to Plaintiff's old address, knowing fully well that neither letter will ever reach her, because she had moved from that address, long before – in February, 2011. Amtrak had her new address on file. Plaintiff claims Mr. Ryan had it in for her, and that her termination was orchestrated in the way it was, done, to ensure that she never get to know on time,

that she had been terminated, and have the opportunity to fight back to get her job

back.

60.   Plaintiff, believes that if she was a white Caucasian woman, Mr. Ryan would

not have terminated her because he knew the reason for her absence and had no other

reason whatsoever, to terminate her, but for his animus against her, based on her race,

sex and disability. Defendants action against Plaintiff is unlawful and in violation of

the District of Columbia Human Rights.

**Count IV: Wrongful Discharge in Violation of Public Policy under the Due
Process Clause of the U.S. Constitution, ADA, and the D.C. Human Rights Act**

61.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 60 above as

though fully set forth herein.

62.   Federal Common Law, and the District of Columbia Common Law, prohibit an

employer from wrongful discharge of an employee, in violation of Public Policy.

63.   Plaintiff claims that Defendant wrongfully discharged her in violation of Public

Policy of the District of Columbia and the United States, when Mr. Ryan,

constructively discharged her, involuntarily, by using Rule 24 of Defendant's CBA,

which requires such action after 10 days.

64.   With knowledge of and the permission of Defendant, Mrs. Said had been out of

work for about many months longer than 10 days. Defendant approved and paid

Plaintiff sickness befits, knowing full well that she was on medical leave, which they

approved. To invidiously and surreptitiously terminate Plaintiff, and imputing her

termination on her, is unconscionable and in violation of Public Policy. By terminating her in a manner that prevented her from knowing, so as to deny her the opportunity to explain herself and protect her employment interests, Defendant effectively violated her due process rights under the U.S. Constitution and took away her property interest in her job, without more.

65.   After Mrs. Said's husband's death, she suffered, prolonged grief, deep depression, anxiety and insomnia, in addition to her having high blood pressure. Mrs. Said loved her job, and wanted to return back to her work. It was on her doctor's orders that Plaintiff did not return to work earlier than she did. As soon as she got better, her doctor certified her return to work, and she returned to work, only to find out that she had been terminated. Defendant's agent's actions against Plaintiff amount to hostility and discrimination, because if Plaintiff was a Caucasian female, she would not have been terminated as she was, for the reasons given.

66.   Defendant's actions in terminating Mrs. Said, while she was sick, and after giving her permission to take as much time off as needed to get well before returning, is unconscionable, and in violation of Federal and D.C. Public Policy. Mr. Ryan's decision to terminate Plaintiff on the basis of Rule 24 of the CBA, is a pretext. The reason Plaintiff was absent from work, was ill-health and Mr. Ryan knew it. Yet he discharged her, on that basis. Plaintiff believes she was wrongfully discharged in violation of public policy under the ADA, Fifth Amendment, and DC Human Rights.

## COUNT V FRAUDULENT MISREPRESENTATION

67.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 66 above as though fully set forth herein.

68. Plaintiff claims and alleges that Defendants wrongfully discharged her in violation of D.C. law, when Defendant's agents falsely told her to take as long as she need to get well before returning to work, and turned back to use the same absence they gave her permission for to terminate her.

69.   Plaintiff claims that when Mr. Ryan, Ms. McClinton, and Ms. Brewer, all told her to take needed time to get well before returning to work, they intended her to act on their assurances, and she acted on it, to her detriment. Defendant fraudulently misrepresented to her that they had the authority to verbally approve her long medical leave without more, when they knew they had no such authority. She relied on their representation and suffered detriment as a result – she lost her job after.

70. Defendant's agents, omitted to give her a definite time to return. They gave her assurances that she will not suffer any negative employment action because they knew all about her circumstances and approved her absence. Instead, they terminated her employment on the basis of her absence from work because she was sick. And absence they had approved for her to take.

71. Because of Defendant's actions, Plaintiff suffered damage. She lost her job, became unemployed, unable to work and earn money, she became homeless as some point for several months, sleeping in her car. She suffered emotional distress, humiliation and shame. Plaintiff suffered damages, as a result of her reasonable reliance on her superiors' assurances that her job will be there for her when she returned. Because Plaintiff suffered detriment, Defendant is liable to her in damages.

## Count VI: Negligent Misrepresentation

72.   Plaintiff incorporates the allegations contained in Paragraphs 1 through 71 above as though fully set forth herein.

73.   Plaintiff claims and alleges that Defendant wrongfully discharged her in violation of D.C. law.

74.   Plaintiff claims that when Mr. Ryan, Ms. McClinton, and Ms. Brewer, all told her to take needed time to get well before returning to work, they intended her to act on their assurances, and she acted on it, to her detriment. Defendant were negligent when they represented to her that they had the authority to verbally approve her long medical leave without more, by telling her to take all the time she needed to get well before returning an without requiring her to fill in any documentation, when they knew they had no such authority. They knew she relied on their assurances. She relied on their representations and suffered detriment as a result – she lost her job after.

75.   As it turns out, representations made to Plaintiff by Mr. Ryan, Ms. McClinton, and Ms. Brewer, to take as long as she needed to recover from her sickness, and that they by implying in their representations to her that they had authority to make them, was false. Because Defendant's agents were Plaintiff's supervisors and managers, they owed her a duty to accurately, correctly and truthfully representations to her, employer's policies that they are obligated to explain to her. When they expressly, verbally gave her permission to be absent from work until she got well, without any kind of paper work to show that permission, they misrepresented to her that they had the authority to give her such permission without more. Apparently they did not have such authority, and because she relied on their representation that they had such authority, she was terminated

because the same agents, who approved her absence, later terminated her because that permission was not documented. As a result she suffered detriment – loss of her job and more. Plaintiff claims Defendant's agents negligently misrepresented their authority and policies to her to her detriment, and as such are liable to her in damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cheryl, Renee Said, requests relief against Defendant, the National Railroad Passengers Corporation, as follows:

(a) That for the actions of invidious discrimination under Title VII alleged in Count I of her complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: reinstatement, front pay, back pay with bonuses, merit-performance increases, awards, retirement contributions, all leave and benefits that are due Plaintiff, in addition to applicable compensatory damages, in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00);


(b) That for the actions of invidious violation of Section 1981, alleged in Count II of her Complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: reinstatement, front pay, back pay with bonuses, merit-performance increases, awards, retirement contributions, and all leave and benefits due Plaintiff, in addition to applicable compensatory damages, in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

(c) That for the actions of invidious violation of the District of Columbia Human Rights Code 1-2501 et seq, alleged in Count III of her Complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: reinstatement, front pay, back pay with bonuses, merit-performance increases, awards, retirement contributions, and all leave and benefits due Plaintiff, in addition to applicable compensatory damages, in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

(d) That for the actions of wrongful discharge in violation of Public Policy, alleged in Count IV of her Complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: reinstatement, front pay, back pay with bonuses, merit-performance increases, awards, retirement contributions, and all leave and benefits due Plaintiff, in addition to applicable compensatory damages, in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

(e) That for the actions of Fraudulent Misrepresentation, alleged in Count V of her Complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: detrimental losses she suffered as a result and compensatory damages for her sufferings and emotional distress in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

(f) That for the actions of Negligent Misrepresentation, alleged in Count VI of her Complaint, the Plaintiff be awarded damages against the Defendant, including but not limited to: detrimental losses she suffered as a result and compensatory damages for her sufferings and emotional distress in the amount of THREE HUNDRED THOUSAND DOLLARS ($300,000.00).

(g) In addition to the above, Plaintiff also request the Court to award her Punitive

damages in the amount of FIVE MILLION EIGHT HUNDRED THOUSAND

DOLLARS ($5,800,000.00).

## JURY TRIAL DEMAND

**The Plaintiff demands a jury trial on all issues triable by a jury.**

Respectfully submitted,

*/s/ Stephen Christopher Swift*
Stephen Christopher Swift
D.C. Bar No. 428459
Swift & Swift, Attorneys at Law, P.L.L.C.
2121 Eisenhower Avenue, Suite 200
Alexandria, Virginia 22314-4688
Telephone: (703) 418-0000
Facsimile: (703) 535-8205
E-Mail: steve@swift.law.pro