# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| CHERYL RENEE SAID, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-1289 (RBW) |
| | ) | |
| NATIONAL RAILROAD PASSENGER | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## <u>MEMORANDUM OPINION</u>

The plaintiff, Cheryl Renee Said, instituted this civil action against the defendant, the National Railroad Passenger Corporation ("Amtrak"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 to -7 (2012) ("Title VII"), § 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11(a)(1) (2012), the Due Process Clause of the Fifth Amendment to the United States Constitution, District of Columbia public policy, and District of Columbia common law.  <u>See</u> Complaint ("Compl.") ¶¶ 3, 64.[1]  Currently before the Court is the Defendant's Motion for Summary Judgment ("Def.'s Mot.").  Upon careful consideration of the

---

[1] Although the plaintiff's Complaint purports that "[t]his action arises under [42 U.S.C. §] 1983," <u>see</u> Compl. ¶ 3, the Complaint contains no counts pleading a § 1983 claim, <u>see generally</u> Compl. ¶¶ 43–75, and the plaintiff makes no other reference to § 1983 in her Complaint or her opposition to the Defendant's Motion for Summary Judgment, <u>see generally</u> Compl.; Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment.  Therefore, the Complaint's reference to § 1983 appears to be an error, and accordingly, the Court need not consider whether a non-existent § 1983 claim is the subject of the defendant's summary judgment motion.

parties' submissions,[2] the Court concludes that it must grant in part and deny in part the defendant's motion.

# I.     BACKGROUND

As an initial matter, the defendant argues that the Plaintiff's Statement of Disputed Facts fails to comply with the Federal Rules of Civil Procedure and the local rules of this Court, and therefore, "the Court should . . . not accept any argument [raised] therein as creating a factual dispute that may defeat [its] motion, deem each of [its] factual statements as admitted, and grant summary judgment in [its] favor on the record evidence it presents in support of its motion." Def.'s Reply at 3.  The defendant further argues that "the Court should disregard all of the unsupported 'facts' and unauthenticated exhibits [the p]laintiff relies upon in opposing [its] motion," emphasizing that the plaintiff has "not set[] forth any of her 'facts' in her [s]eparate [s]tatement[, and] has complied with none of the[] requirements [in the federal and local rules] for the purported 'facts' in her brief."  Id. at 4.

The Court agrees with the defendant that the plaintiff's submissions to the Court fail to comply with both the federal and local rules in a number of respects.  The Plaintiff's Statement of Disputed Facts fails to comply with Local Rule 7(h), which requires "[a]n opposition . . . [to include] a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, . . . [and] references to the

---

[2] In addition to the filings already identified, the Court also considered the following submissions in rendering its decision: (1) the Defendant's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Def.'s Mem."); (2) the Defendant's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment (the "Defendant's Statement of Undisputed Facts" or "Def.'s Facts"); (3) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); (4) the Plaintiff's Statement of Disputed Genuine Material Facts in Dispute in Support of Her Opposition to Defendant's Motion for Summary Judgment (the "Plaintiff's Statement of Disputed Facts" or "Pl.'s Disputed Facts"); and (5) the Defendant's Reply Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Def.'s Reply").

parts of the record relied on to support the statement," LcvR 7(h)(1), and also Federal Rule of Civil Procedure 56(c)(1), which similarly requires that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by [ ] citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1).  Although the Plaintiff's Statement of Disputed Facts purports to identify seven broad "issues" in dispute, it fails to set forth any statements of fact or provide any corresponding citations to the record.  See, e.g., Pl.'s Disputed Facts ¶ 4 (asserting merely that "[t]here is a genuine material issue of fact in dispute as to whether [the d]efendant's claimed reason for terminating [the p]laintiff[] was a pretext and a cover up").  Furthermore, the Plaintiff's Statement of Disputed Facts fails to specifically respond to the individual statements of fact asserted in the Defendant's Statement of Undisputed Facts.  See id. at 2 (generally asserting only that "[w]ith the exception of [ ] nos. 1- 6, . . . [the d]efendant[']s undisputed facts are arguments, and as such [the p]laintiff disputes [the d]efendant[']s claimed [u]ndisputed facts").  Moreover, although "the 2010 amendments to Federal Rule of Civil Procedure 56 eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion [or opposition] must be authenticated," Akers v. Beal Bank, 845 F. Supp. 2d 238, 243 (D.D.C. 2012) (internal quotation marks omitted), it is still the plaintiff's "burden [as the proponent [of the material cited to support or dispute a fact] to show that the material is admissible as presented or to explain the admissible form that is anticipated," Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 Amendment, subsection c, and the plaintiff has failed to do that here, at least not in a manner that is apparent to the Court.  And finally, the defendant is correct that aside from intermittent citations to these same exhibits, the plaintiff's opposition is almost entirely devoid of citations to the record.  See generally Pl.'s Opp'n.

Although the Court is troubled by the plaintiff's counsel's non-compliance, which "makes the work of the Court more onerous," Lawrence v. Lew, 156 F. Supp. 3d 149, 155–56 (D.D.C. 2016), in the interest of resolving the defendant's summary judgment motion without further delay, and because "strong policies favor the resolution of genuine disputes on their merits," Jackson v. Beech, 636 F.2d 831, 832 (D.C. Cir. 1980), the Court declines to "disregard" all of the plaintiff's facts and exhibits or deem the Defendant's Statement of Undisputed Facts admitted. Rather, the Court will consider the plaintiff's facts and exhibits to the extent that they are relevant and supported by evidence in the record that is readily identifiable by the Court. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); see also Chambliss v. Nat'l R.R. Passenger Corp., Civ. Action No. 05-2490 (CKK), 2007 WL 581900, at *2 (D.D.C. Feb. 20, 2007) ("Despite [the p]laintiff's abject failure to comply with his obligations under Local Civil Rule 56.1 . . . , in the interest of justice, the Court has nevertheless undertaken a review of the record evidence . . . in order to determine whether that evidence raises genuine issues of fact."). Furthermore, the Court will make an independent assessment as to whether the facts in the Defendant's Statement of Undisputed Facts are indeed undisputed by the plaintiff. See Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may[] . . . consider the fact undisputed for purposes of the motion." (emphasis added)).[3]

Based on the Court's independent review of the record evidence, including the plaintiff's deposition testimony, the Court concludes that the following relevant facts are undisputed, with

---

[3] The Court notes that the plaintiff has raised no objection to the admissibility of the exhibits submitted by the defendant in support of its motion, see generally Pl.'s Opp'n, which are supported by a declaration from the defendant's counsel, see generally Def.'s Mot., Attachment (Declaration of Joshua B. Waxman in Support of Defendant's Motion for Summary Judgment (Apr. 28, 2017)).

the exception of facts attributed solely to the plaintiff's deposition testimony or otherwise noted

as an allegation by the plaintiff. The "[p]laintiff, an African American female," was employed

by Amtrak as a Lead Service Attendant [ ] based out of Washington, D.C. Def.'s Facts ¶ 1

(footnote omitted); see also Def.'s Mot., Att. (Declaration of Joshua B. Waxman in Support of

Defendant's Motion for Summary Judgment (Apr. 28, 2017) ("Waxman Decl.")), Exhibit ("Ex.")

A (Deposition Transcript of Cheryl Renee Said (Feb. 13, 2017)) ("Said Dep.") 23:22–25. During

the plaintiff's employment with Amtrak, she was a "member[] of a bargaining unit whose terms

and conditions of employment [we]re governed by a collective bargaining agreement ('CBA')

between Amtrak and [the] Amtrak Service Workers Council ( . . . the 'Union')." Def.'s Facts

¶ 5; see also Said Dep. 30:14–25. The plaintiff's direct supervisor was On-Board Services

Manager Phyllis McClinton, see Def.'s Facts ¶ 2; see also Said Dep. 26:16–18, an African

American female, see Def.'s Facts ¶ 4, and Philip Ryan, a Caucasian male, was the Washington,

D.C. Crew Base Manager, Def.'s Facts ¶¶ 44, 46; see also Said Dep. 79:25–80:2. "Per the

[U]nion contract, [Ryan] was [also] the [plaintiff's] supervisor," Def.'s Mot., Att. (Waxman

Decl.), Ex. C (DCOHR Interview with Phil Ryan, Crew Base Manager ("Ryan Interview") (Oct.

29, 2013)) at DCOHR000038; however, he "was not [the p]laintiff's day-to-day supervisor,"

Def.'s Facts ¶ 46.

The plaintiff testified during her deposition that in 2010, "around two months before"

February 2, 2011, see Said Dep. 89:9–10, she was "confronted" by Ryan, id. 87:17–21, who,

according to the plaintiff, called her to his office because he "had assumed that [she] was not at

[her] post, and he wanted to . . . discipline [her]," id. 87:14–17. She testified that McClinton and

a fellow Lead Service Agent, Lee Lockhart, a Caucasian male, were also present during the

encounter, id. 87:17–21, 89:11–22, 92:25–93:1, and that Lockhart "spoke up for [her] to let

[Ryan] know that [she] was where [she] was suppose[d] to be," id. 93:4–5. She further testified that "as [she was] leaving" Ryan's office, Ryan "mentioned to [her,] . . . I thought it was you, because you all look alike." Id. 87:22–24. The plaintiff asserted that Lockhart was present when Ryan made this statement, id. 89:20–22, but "McClinton was not [with]in the distance where she could hear [Ryan's statement]" because she had left the office before the statement was made, id. 90:3–10.

On February 1, 2011, the plaintiff's husband died as a result of suffering an aneurysm, see id. 47:12–48:18, and "[o]n or about February 2, 2011, [the p]laintiff began a leave of absence due to her husband's death," Def.'s Facts ¶ 13; see also Said Dep. 51:8–13. "[A]bout a week later, [the plaintiff] spoke with [ ] McClinton by phone," Def.'s Facts ¶ 14, who, according to the plaintiff, informed the plaintiff "that [she] was putting [the plaintiff] on bereavement leave," Said Dep. 82:13–14. Then, on February 15, 2011, "McClinton [ ] submitted a request for [the p]laintiff to take a personal leave of absence." Def.'s Facts ¶ 14; see also Said Dep., Ex. 7 (Request for Leave of Absence/Return from Leave of Absence (Feb. 15, 2011) (the "February 15, 2011 Request")). The request indicated that the leave of absence would have an "Effective Date" of February 20, 2011, and an "Estimated Return from [the Leave of Absence] Date" of March 1, 2011. Said Dep., Ex. 7 (February 15, 2011 Request).[4]

The plaintiff testified that around two weeks after receiving McClinton's first phone call, McClinton contacted her again and informed her that she "was putting [the plaintiff] on [ ]

---

[4] The Defendant's Statement of Undisputed Facts states that McClinton's first request for a leave of absence on the plaintiff's behalf sought a return date of April 1, 2011, from the leave of absence, see Def.'s Facts ¶ 14; however, the document the Defendant's Statement of Undisputed Facts cites as support for this assertion is a leave of absence request form introduced by the defendant at the plaintiff's deposition, which indicates an "Estimated Return from [the Leave of Absence]" on March 1, 2011, see Said Dep., Ex. 7 (February 15, 2011 Request). Therefore, the Court concludes for purposes of the defendant's motion for summary judgment that the estimated return date associated with McClinton's first request for a leave of absence for the plaintiff was March 1, 2011.

personal leave." Id. 82:18–25. During that conversation, McClinton "[a]sked [the plaintiff] how [she] was feeling, and [the plaintiff] told [McClinton] that [she] was not feeling very well," to which McClinton responded "take all the time [you] need[]." Id. 83:5–9. The plaintiff further testified that she told McClinton that she "needed health insurance," and McClinton said "she would look into it." Id. 83:13-15. McClinton subsequently "called [the plaintiff] back about a week later," and told the plaintiff "that Amtrak was not able to insure [her] because [she] was on leave without pay," but again told her that she should "take all the time that [she] needed to get well to return to work." Id. 83:15–19.

On March 31, 2011, "[a]fter speaking with [the p]laintiff again by phone, [ ] McClinton submitted a request for an extension of [the p]laintiff's personal leave until April 30, 2011." Def.'s Facts. ¶ 17; see also Said Dep., Ex. 8 (Request for Leave of Absence/Return from Leave of Absence (Mar. 31, 2011) (the "March 31, 2011 Request")). The request indicated that the leave of absence would have an "Effective Date" of March 26, 2011, and an "Estimated Return from [the Leave of Absence] Date" of April 30, 2011. Said Dep., Ex. 8 (March 31, 2011 Request).[5] "[The p]laintiff and [ ] McClinton spoke again at some point in or around April 2011, at which time [ ] McClinton verbally extended [the p]laintiff's leave without a specific return

---

[5] The Court notes that the record does not contain any documentation purporting to authorize the plaintiff's leave of absence for the period between March 1, 2011, the "Estimated Return from [the Leave of Absence Date]" indicated on McClinton's first leave of absence request form, see Said Dep., Ex. 7 (February 15, 2011 Request), and March 26, 2011, the "Effective Date" indicated on McClinton's second leave of absence request form, see Said Dep., Ex. 8 (March 31, 2011 Request). Although the plaintiff has attached to her opposition a third leave of absence form dated March 8, 2011, with an "Effective Date" of February 26, 2011, and no "Estimated Return from [the Leave of Absence] Date," see Pl.'s Opp'n, Ex. I (Request for Leave of Absence/Return from Leave of Absence (Mar. 8, 2011)) at 3, she does not assert that this form authorized her leave of absence during any period, but argues only that it demonstrates that the defendant's documentation of her leave "make[s] no sense," id. at 16. Additionally, the defendant notes that the form "actually denotes an expected return to work date [of February 26, 2011], not an extension of leave." Def.'s Reply at 8 n.3. In any event, because the defendant does not appear to dispute the plaintiff's authorization to be absent from work at any point prior to April 30, 2011, see Def.'s Facts ¶ 17 ("McClinton submitted a request for an extension of [the p]laintiff's personal leave until April 30, 2011."), and the plaintiff does not argue that the third leave of absence form authorized a leave of absence for her beyond that point, see Pl.'s Opp'n at 16, the Court concludes that the third leave of absence form is irrelevant to its summary judgment analysis.

date." Def.'s Facts ¶ 18 (citing Said Dep. 57:18–23); <u>see also</u> Said. Dep. 85:16–20 (testifying

that she spoke to McClinton on the phone "sometime before early May 2011," when McClinton

called her to "check[] to see how [she] was doing," and McClinton told her that "she[] [would]

continue to put [her] on leave without pay").

On February 24, 2011, the plaintiff moved her residence from Washington, D.C. to

Maryland. <u>See</u> <u>id.</u> 76:13–19, 84:11. The plaintiff testified that around the date of her move, she

verbally notified an employee named Cassandra at Amtrak's "crew base" of her new address, <u>see</u>

<u>id.</u> 107:21–108:24, 113:2, as well as another person at "the crew management base," <u>id.</u> 84:12–

15, 113:2. She also testified that she "talked to someone" at Amtrak's Human Resources office

in Wilmington, Delaware, <u>id.</u> 110:7–9, and "faxed [her] . . . new address" to that office, <u>id.</u>

112:5–6. The plaintiff also testified that around the same time, she "gave [McClinton her new]

address," <u>id.</u> 83:20–23, and "about one to two weeks later," she "received a [condolence] card"

from McClinton at her new address, <u>id.</u> 84:1–2; <u>see also</u> Def.'s Facts ¶ 16. Furthermore, on

April 29, 2011, the "[p]laintiff contacted the [Amtrak] Employee Service Center [ ] to change her

address," Def.'s Facts ¶ 21; <u>see also</u> Said Dep., Ex. 12 (Record of April 29, 2011 conversation

with Jacqueline King), and she "spoke with Human Capital Representative Jacqueline King,"

Def.'s Facts ¶ 23. Following that conversation, "King emailed [the p]laintiff a change-of-address

form to complete," <u>id.</u> ¶ 24; however, the plaintiff testified that she did not remember if she filled

out the change-of-address form and returned it, Said Dep. 115:12–15, and "Amtrak has no record

of [the p]laintiff returning the change-of-address form that [ ] King sent her in April 2011,"

Def.'s Facts ¶ 27.

"In [or] about April 2011, Amtrak received correspondence from [the p]laintiff's

husband's life insurance carrier (Security Mutual Life) requesting that Amtrak verify certain

information." Id. ¶ 28.  In "the first part of May [2011]," Said Dep. 85:10–15, Ryan "called [the p]laintiff on her phone (the number of which did not change when she moved) to ask if he could release information to the insurer," Def.'s Facts ¶ 29.  "[The p]laintiff agreed, and [ ] Ryan [ ] responded to the insurer with the requested information." Id. ¶ 28; see also Def.'s Mot., Att. (Waxman Decl.), Ex. E (Deposition of Philip Roger Ryan (Feb. 23, 2017)) ("Ryan Dep."), Ex. A (Letter from Philip Ryan, Manager, Washington Crew Base, to Security Mutual Life Insurance Company of New York (Apr. 15, 2011) ("Security Mutual letter")) at 3.

"In or about July 2011, [the p]laintiff encountered [Assistant Superintendant Kathy] Brewer," McClinton's supervisor and an African American female, "at a grocery store." Def.'s Facts ¶¶ 4, 30.  According to the plaintiff's testimony, she told Brewer that she "wasn't doing well at all," and Brewer told her to "take all the time you need to get well." Said Dep. 102:12–17.  The plaintiff also testified that Brewer told her that she "was able to receive disability benefits from the Railroad Retirement Board" (the "Board"), id. 102:19–22, which "administers benefits for all railroad[] [employees] in the United States, including Amtrak [employees]," Def.'s Facts ¶ 31.  Thereafter, also "in or about July 2011," the plaintiff applied for sickness benefits from the Board, Def.'s Facts ¶ 34; see also Said Dep. 102:19–23, and "provided the [Board] with her [new] address[] and communicated with the [Board] via the address she provided," Def.'s Facts ¶ 34.  The plaintiff further testified that she "started receiving [benefits] in August of 2011," Said Dep. 102:22–23, and while receiving these benefits, the Board periodically sent her forms, which she "sen[t] to [her] doctor to fill out about [her] condition [and] progress," id. 105:17–19, and then she returned the forms to the Board once they were completed, see id. 106:5–7.

In July 2011, McClinton also took a medical leave of absence, see Def.'s Mot., Att. (Waxman Decl.), Ex. B (DCOHR Interview with Phyllis McClinton, Supervisor (Nov. 14, 2013)) at DCOHR000045; see also Def.'s Facts ¶ 3, during which time "On-Board Service Manager Patricia Baylor," an African American female, "assumed some of [ ] McClinton's supervisory responsibilities," Def.'s Facts ¶¶ 3–4. "At some point [thereafter] . . . , it was brought to [ ] Baylor's attention that . . . [the p]laintiff[] had been absent for an extended period of time." Id. ¶ 42. Baylor "tried by phone" to reach the plaintiff, but "wasn't able to reach her." Def.'s Mot., Att. (Waxman Decl.), Ex. D (DCOHR Interview with Patricia Baylor, On-Board Services Manager (Oct. 29, 2014) ("Baylor Interview")) at DCOHR000041–42; see also Def.'s Facts ¶ 43 (stating that Baylor "tr[ied] to reach [the p]laintiff"). In addition, "Baylor contacted Amtrak's Medical Department to determine whether [the p]laintiff was on an approved medical leave, and she was told that Amtrak had no record of [the p]laintiff being on [medical] leave." Def.'s Facts ¶ 43.

On September 30, 2011, Baylor forwarded an e-mail to Ryan, which she also sent to Brewer, informing him that "[t]he department [had not] heard from [the plaintiff] concerning [her] absence from work for the past several months[, and that t]his is clearly a violation of the Attendance policy and [stated that] a Rule 24 letter [wa]s necessary at th[at] time." Ryan Dep., Ex. A (E-mail from Patricia Baylor to Philip Ryan (Sept. 30, 2011) (the "Sept. 30, 2011 E-mail")) at 1. "Per [ ] Baylor's instruction . . . , [ ] Ryan prepared a letter to [the p]laintiff . . . , using the address on file in Amtrak's [ ] database," Def.'s Facts ¶ 47, which the plaintiff asserts was her former Washington, D.C. address, see Said Dep. 62:23–25 ("[A] letter had been sent to my old address, want[ing] to know my whereabouts, and where I had been[.]"), and "[p]rior to sending the letter, . . . [he] contacted Amtrak's Human Resources Department to confirm [the

p]laintiff's address," Def.'s Facts ¶ 47.  Thereafter, "Ryan sent the [ ] letter to [the p]laintiff via

Federal Express . . . , copying [ ] Baylor and [ ] Brewer, as well as Dwayne Bateman, [the

p]laintiff's Union representative."  Id. ¶ 48.  In the letter, dated October 12, 2011, Ryan "advised

[the plaintiff] that the Medical Department ha[d] not received an update for [her] absence from

work," and that "[i]n order to continue [her] absence, [she was] instructed to contact the Medical

Department immediately and provide whatever documentation necessary to update [her]

records."  Said Dep., Ex. 18 (Letter from Philip Ryan, Manager, Washington Crew Base, to

Cheryl Said (October 12, 2011) (the "Rule 24 notification letter")).  It further warned that

> failure to comply with these instructions will invoke Rule 24 of the [Union]
> contract, which reads in part . . . ["]Employees who are absent from work for [ten]
> days without notifying the company[] shall be considered resigned from the
> corporation, unless the corporation is furnished satisfactory evidence that the
> failure is due to circumstances beyond their control."

Id., Ex. 18 (Rule 24 notification letter) (omission in original).  The Rule 24 notification "letter

was returned to Amtrak as undeliverable."  Def.'s Facts ¶ 50.  As a result of the letter being

returned, Ryan "contacted [ ] Bateman to determine whether the [Union] had a different address

for [the p]laintiff," but "Bateman advised [him] that the [Union] had the same address on file that

Amtrak had."  Id.  However, "Ryan did not attempt to contact [the p]laintiff by []phone,"

consistent with "Amtrak's policy to send Rule 24 communications exclusively in writing, so as

to have a clear record of the same."  Id. ¶ 51.

On November 4, 2011, "[b]ecause [the p]laintiff did not respond to the [ ] Rule 24

[notification] letter," id. ¶ 52, Ryan sent a second letter to the plaintiff, which served as "official

notification that [the plaintiff was] [ ] considered resigned," Said Dep., Ex. 19 (Letter from Philip

Ryan, Manager, Washington Crew Base, to Cheryl Said (Nov. 4, 2011) (the "Rule 24

termination letter")).  Specifically, the letter stated:

There has been no response or notification of your prolonged absence from work at Amtrak. In a letter sent to you on October 12, 2011, . . . you were instructed to notify the corporation [of] your absence. In the letter, you were informed that failure to do so w[ould] invoke Rule 24 of the [Union] contract, and you w[ould] be considered as resigned from the corporation.

Id., Ex. 19 (Rule 24 termination letter). "On November 7, 2011, [the p]laintiff's termination was recorded by Amtrak as an 'involuntary separation,' effective November 4, 2011, without eligibility for rehire[,]" Def.'s Facts ¶ 53, with the reason recorded as "No Return from [Leave of Absence]," Ryan Dep., Ex. D (Involuntary Separation form). The plaintiff testified that she "never received" either of the Rule 24 letters from the defendant. Said Dep. 124:3–4.

"On or about February 7, 2012, [the p]laintiff appeared at the Washington[,] D.C. crew base," Def.'s Facts ¶ 55 (footnote omitted), "to let the[] [defendant] know that [her] doctor had released [her] to return back to work on February 19," Said Dep. 62:4–6. However, "Ryan advised [the plaintiff] that her employment had been terminated," Def.'s Facts ¶ 55, and he further "advised [her] to discuss the situation with her Union and provided her with [ ] Bateman's []phone number," id. ¶ 56; see also Said Dep. 62:10–14. The "[p]laintiff contacted . . . Bateman," Def.'s Facts ¶ 61; see also Said Dep. 62:16–18, and informed him that she "had just found out that [she] had been terminated," Said Dep. 62:20–21. Thereafter, the Union "advised her that [it] would not file a grievance on her behalf," Def.'s Facts ¶ 61, and the "[p]laintiff did not pursue her grievance to the National Railroad Adjustment Board or public law board," id. ¶ 63; see also Said Dep. 66:14–21 (acknowledging that she did not file a formal grievance).

On January 30, 2013, the plaintiff submitted an Intake Questionnaire to the District of Columbia Office of Human Rights ("DCOHR"), see Def.'s Facts ¶ 64; see also Def.'s Mot., Att. (Waxman Decl.), Ex. F (Employment Intake Questionnaire) at DCOHR000019, and, on May 30, 2013, she filed a Charge of Discrimination with the DCOHR, in which she alleged that the

defendant had unlawfully terminated her employment based on her race, gender, and disability, see Def.'s Facts ¶ 65. On or about January 13, 2014, the DCOHR issued a determination letter, id. ¶ 67, which found "no probable cause to believe" the plaintiff's claims, Def.'s Mot., Att. (Waxman Decl.), Ex. G (Letter of Determination – No Cause Finding (Jan. 13, 2014)) at DCOHR000079. Thereafter, on May 4, 2015, the plaintiff alleges that the Equal Employment Opportunity Commission ("EEOC") mailed her a "Dismissal and Notice of Rights" letter. Compl., Ex. A (Dismissal and Notice of Rights) at 1. The plaintiff filed this suit on August 11, 2015. See Compl. at 1.

## II.     STANDARD OF REVIEW

Courts will grant a motion for summary judgment under Federal Rule of Civil Procedure 56(a) "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a Rule 56(a) motion, the Court must view the evidence in the light most favorable to the non-moving party. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)). The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but . . . must set forth specific facts showing that there [are] [ ] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (second omission in original) (citation and internal quotation marks omitted). Thus, "[t]he mere

existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## III.    ANALYSIS

### A.    The Plaintiff's Title VII Claims

The defendant argues that the plaintiff's Title VII claims are time-barred "[b]ecause [the p]laintiff did not file her Charge [of Discrimination] (or even initiate the administrative process via the intake questionnaire) until well after [the three-hundred-]day[] [statutorily required administrative filing period] had elapsed." Def.'s Mem. at 4. The Court agrees.

The District of Columbia Circuit has made clear that "Title VII '[c]omplainants must timely exhaust the[ir] administrative remedies before bringing their claims to court.'" Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (alterations in original) (quoting Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997)). To exhaust her administrative remedies, "a complainant must file a charge of discrimination with the EEOC within [three hundred] days of [the alleged unlawful] practice if the complainant 'has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice.'" Lattisaw v. District of Columbia, 118 F. Supp. 3d 142, 154 (D.D.C. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) ("[A]n employee who initially files a grievance with [a state] agency must file the charge with the EEOC within [three hundred] days of the employment practice.").

Here, the parties agree that the plaintiff initially instituted the proceedings in this case by filing an Intake Questionnaire with the DCOHR, see Def.'s Facts ¶ 64; Pl.'s Opp'n at 7, and that the statutory period for filing an administrative charge with the EEOC commenced on the day

when the plaintiff first learned about her termination, <u>see</u> Def.'s Mem. at 4; Pl.'s Opp'n at 8, which the plaintiff testified was February 7, 2012, <u>see</u> Said Dep. 61:2–3.[6] Therefore, the plaintiff was required to file her charge of discrimination with the EEOC within three hundred days thereafter, or by December 3, 2012. Curiously, neither party has provided the Court with a date when the plaintiff filed a charge of discrimination with the EEOC, and the plaintiff actually insists that she "did not file her Complaint with the EEOC," but rather that "[h]er Complaint was only sent to the EEOC for 'substantial review' of the DCOHR decision which [she] challenged." Pl.'s Opp'n at 7. However, the DCOHR's Letter of Determination submitted by the defendant suggests that a charge of discrimination was indeed filed with the EEOC, as the letter purports to relate to an "EEOC No." of "10C-2013-00242," <u>see</u> Def.'s Mot., Att. (Waxman Decl.), Ex. G (Letter of Determination – No Cause Finding) at 1, and the EEOC Dismissal and Notice of Rights letter attached to the plaintiff's Complaint refers to an "EEOC Charge No." that matches the "EEOC No." recorded by the DCOHR, <u>see</u> Compl., Ex. A (Dismissal and Notice of Rights) at 1. Nonetheless, it appears that any EEOC charge was not timely filed. The plaintiff's "EEOC Charge No.," which contains a reference to the year "2013," suggests that the charge was filed in that year, and therefore could not have been filed until January 1, 2013 at the earliest, approximately one month past the statutory deadline. Alternatively, the plaintiff's assertion that she "did not file her Complaint with the EEOC," Pl.'s Opp'n at 7, suggests that her EEOC charge was automatically generated pursuant to "the worksharing agreement between the . . . []DCOHR[] and the EEOC, . . . [which] operates so that '[c]harges received by one agency under

---

[6] Despite what she said during her deposition, the plaintiff asserts in her opposition that she did not learn about her termination until February 9, 2012, <u>see, e.g.</u>, Pl.'s Opp'n at 16; however, she does not cite to any fact in the record to support this claim, <u>see generally</u> Pl.'s Opp'n. In any event, even if the plaintiff did not find out about her termination until February 9, her Title VII claims would still be untimely because, as explained in further detail <u>infra</u>, the record evidence demonstrates that her DCOHR charge of discrimination was untimely by at least several weeks and potentially several months.

the agreement shall be deemed received by the other agency,'" <u>Miller v. Gray</u>, 52 F. Supp. 3d 62,

68 (D.D.C. 2014) (third alteration in original) (quoting <u>Schuler v. PriceWaterhouseCoopers LLP</u>,

514 F.3d 1365, 1372 (D.C. Cir. 2008)).  And, because the plaintiff does not dispute that she did

not initiate the DCOHR proceedings related to her case until January 20, 2013, when she filed

her Intake Questionnaire, <u>see</u> Pl.'s Opp'n, Ex. B (Employment Intake Questionnaire) at

DCOHR000019, and that she did not file her DCOHR charge until May 30, 2013, <u>see</u> Def.'s

Facts ¶ 65, her EEOC charge could not have been "cross-filed" prior to those dates, which are

nearly two months and six months after the expiration of the statutory period, respectively.

Therefore, in the absence of any evidence suggesting the contrary, the Court must conclude that

any EEOC charge related to the plaintiff's case was not timely filed.

Nonetheless, the plaintiff argues that her claims are timely because she "filed her

discrimination [c]omplaint with the . . . []DCOHR[], [and] the limitation[s] period under D[.]C[.]

[ ] law is one year."  Pl.'s Opp'n at 7.  However, as the defendant correctly notes, the Supreme

Court has foreclosed the plaintiff's argument that any statute of limitations provided in the D.C.

Code applies to a Title VII claim.  <u>See</u> Def.'s Reply at 5 (citing <u>EEOC v. Comm. Office Prods.</u>

<u>Co.</u>, 486 U.S. 107, 123 (1988)); <u>see also</u> <u>Comm. Office Prods. Co.</u>, 486 U.S. at 123 ("[S]tate

time limits for filing discrimination claims do not determine the applicable federal time limit.").

Consequently, because the plaintiff did not timely file a charge of discrimination with the EEOC,

her Title VII claims are time-barred.  <u>See</u> <u>Dyson v. District of Columbia</u>, 808 F. Supp. 2d 84, 87

(D.D.C. 2011) (dismissing the plaintiff's Title VII claims as untimely because the plaintiff did

not file her EEOC charge within the three-hundred-day time period).[7]

---

[7] The Court notes that the plaintiff does not argue that the Title VII statute of limitations should be equitably tolled for any reason.  <u>See generally</u> Pl.'s Opp'n.  To the extent that she incorporates her equitable tolling arguments made in the context of her wrongful termination and misrepresentation claims, for the reasons explained in Part III.E, <u>infra</u>, the Court finds those arguments unpersuasive.

**B.      The Plaintiff's Section 1981 Race Discrimination Claim**

The defendant argues that the plaintiff's discrimination claim under 42 U.S.C. § 1981 must "fail because Amtrak has proffered a legitimate, non[]discriminatory reason for [the p]laintiff's termination, which she cannot demonstrate was pretextual." Def.'s Mem. at 6.[8]  The plaintiff responds that the "[d]efendant's reason[] for terminating her . . . is [ ] pretext and [a] cover up [and i]t is a lie that [the d]efendant did not know . . . that [she] was absent from work due to illness." Pl.'s Opp'n at 9.  For the reasons explained below, the Court concludes that the plaintiff's race discrimination claim under § 1981 survives summary judgment, albeit barely, considering the position this Circuit has taken in prior cases.

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  "[I]n order for [the p]laintiff's claims under . . . [s]ection 1981 to survive summary judgment, [she] must provide direct or circumstantial evidence of [the d]efendant['s] discriminatory intent." Telesford v. Md. Provo-I Med. Servs., P.C., 204 F. Supp. 3d 120, 128 (D.D.C. 2016).  Direct evidence, "for example, a statement that itself shows racial or gender bias in the decision," "generally entitle[s] a plaintiff to a jury trial." Vatel v. All. of Auto Mfrs., 627 F.3d 1245, 1246–47 (D.C. Cir. 2011).  However, "[i]f a . . . plaintiff does not proffer direct evidence of discrimination, '[courts] apply the analytical framework adopted by the Supreme Court in McDonnell Douglas.'" Hairston v. Vance-Cooks, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting Ginger v. District of Columbia, 527 F.3d 1340, 1344 (D.C. Cir. 2008)); see also Carney v. Am. Univ., 151 F.3d 1090, 1092–93 (D.C.

---

[8] In summarizing the defendant's arguments regarding the plaintiff's § 1981 claim, the Court cites to the portion of the defendant's brief that addresses the plaintiff's Title VII claims because the defendant raises the same arguments against both claims.  See Def.'s Mem. at 14 (asserting that the "[p]laintiff's [s]ection 1981 claim . . . fails for the same reasons" as her Title VII claims).

Cir. 1998) (applying the <u>McDonnell Douglas</u> framework to a plaintiff's section 1981 claim).

Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of

discrimination, <u>see</u> <u>Reeves</u>, 530 U.S. at 142, and if the plaintiff establishes a prima facie case,

"[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory

reason for the [adverse employment action]," <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792,

802 (1973). However, this Circuit has instructed that once the employer offers a legitimate,

nondiscriminatory justification for its action, "the <u>McDonnell Douglas</u> framework—with its

presumptions and burdens—disappears, and the sole remaining issue is discrimination <u>vel non</u>."

<u>Jackson v. Gonzales</u>, 496 F.3d 703, 707 (D.C. Cir. 2007) (citation and quotation marks omitted).

In other words, when the "employer has asserted a legitimate, non[]discriminatory reason for" an

adverse employment action in the context of a summary judgment motion, "the district court

need not—<u>and should not</u>—decide whether the plaintiff actually made out a prima facie case

under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir.

2008). Rather, the district court must evaluate only whether "the employee [has] produced

sufficient evidence for a reasonable jury to find that the [employer's] asserted

non[]discriminatory reason [for the adverse action] was not the actual reason and that the

[employer] intentionally discriminated against the [employee] on the basis of race." <u>Id.</u> To

make this showing, the plaintiff must produce evidence "showing either 'that a discriminatory

reason more likely motivated the employer or . . . that the employer's proffered explanation is

unworthy of credence.'" <u>Oviedo v. Wash. Metro. Area Transit Auth.</u>, 299 F. Supp. 3d 50, 60

(D.D.C. 2018) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

Here, the defendant has asserted legitimate, nondiscriminatory reasons for the plaintiff's

termination, alleging that the

> [p]laintiff was terminated pursuant to Rule 24 of the [Union's] CBA after failing to communicate with Amtrak during her extended leave of absence, failing to advise Amtrak of the reason she continued to be on leave or her expected return date, and failing to respond to correspondence from Amtrak regarding the same.

Def.'s Mem. at 6.[9]  Consequently, the Court must consider whether the plaintiff has produced sufficient evidence for a reasonable jury to infer that these reasons provided by the defendant for the plaintiff's termination are "pretextual and that this pretext shielded discriminatory motives." Jackson, 496 F.3d at 707.  For the reasons explained below, the Court concludes that the plaintiff has satisfied her burden.

### 1.     Ryan's Alleged Discriminatory Statement

"[E]vidence, direct or circumstantial, that permits an inference of discrimination . . . include[s] discriminatory statements by the employer, or other attitudes suggesting the decision maker harbors discriminatory animus." Holcomb, 433 F.3d at 899 (citations omitted).  As evidence of the defendant's discriminatory intent, the plaintiff proffers her testimony regarding the remark Ryan allegedly made to her that "I thought it was you. You all look alike," see Said Dep. 93:6–7, which she argues demonstrates that "Ryan had [ ] discriminatory animus against her," Pl.'s Opp'n at 24.  According to the plaintiff's testimony, Ryan made the comment after

---

[9] The plaintiff argues that the "[d]efendant did not claim to have terminated [the p]laintiff for [a] common legitimate reason . . . [,] such as . . . because she was not a good or competent worker," but "terminated her [for the] 'special' 'uncommon' reason [of] Rule 24 of the CBA." Pl.'s Opp'n at 30.  Although this Circuit has held that a plaintiff's "show[ing] that [her] termination was not attributable to either of the two most common legitimate reasons for termination: performance below the employer's expectations or the elimination of the plaintiff's position altogether . . . is sufficient to satisfy a plaintiff's burden of establishing a prima facie case at the summary judgment stage," Harris v. D.C. Water & Sewer Auth., 791 F.3d 65, 70 (D.C. Cir. 2015), there is no legal requirement for defendants to show that a termination was attributable to a common legitimate reason to satisfy their burden to articulate a legitimate, nondiscriminatory reason for an adverse employment action.  Rather, to satisfy that burden, the "defendant must merely 'set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [termination],'" Ramseur v. Perez, 80 F. Supp. 3d 58, 68 (D.D.C. 2015) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977)).  In any event, the plaintiff does not cite any case law for the proposition that a Rule 24 violation is not performance-related; to the contrary, courts appear to assume that violations of employment rules and policies are performance issues for purposes of determining whether an employer terminated a plaintiff for a "common legitimate reason." See, e.g., Chambliss, 2007 WL 581900, at *18 (assuming, if true, that the plaintiff's violation of Amtrak's attendance policy would constitute the common legitimate reason of finding that her performance fell below Amtrak's legitimate expectations).

"confront[ing]" her in his office because he "had assumed that [she] was not at [her] post, and he wanted to . . . discipline [her]." Said Dep. 87:15–21. She further testified that Ryan "might have mistake[n] [her] for another [b]lack [ ] female, but it [was not her] that . . . was [not] at [her] post." Id. 94:1–3.

The plaintiff has not explicitly argued that Ryan's comment constitutes direct evidence of discrimination. See generally Pl.'s Opp'n. However, even if she had raised this argument, it would fail. "To qualify as direct evidence, a statement or remark must 'itself show[] . . . bias in the employment decision.'" Conn v. Am. Nat'l Red Cross, 149 F. Supp. 3d 136, 146 (D.D.C. 2016) (alteration in original) (quoting Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014)). In other words, "direct evidence is evidence that, if believed by the fact finder, proves the particular fact in question without any need for inference." Hajjar–Nejad v. George Wash. Univ., 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (quoting Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 86 (D.D.C. 2006) (Walton, J.)). Ryan's alleged remark that "[y]ou all look alike," Said Dep. 93:6–8, "is ambiguous and does not clearly refer to [the p]laintiff's [race]," Hajjar–Nejad, 37 F. Supp. 3d at 125. Therefore, an inference is required to conclude that Ryan was referring to the plaintiff's race, "rather than some other distinction between himself and [the p]laintiff." Id. Accordingly, the alleged remark does not constitute direct evidence. See Breen v. Chao, 253 F. Supp. 3d 244, 258 n.9 (D.D.C. 2017) (concluding that alleged comments regarding the plaintiff's age did not constitute direct evidence of age discrimination because "they [we]re subject to multiple interpretations").

However, the Court concludes that Ryan's alleged comment does constitute indirect evidence of discrimination that must be considered by the Court in conjunction with the other evidence proffered by the plaintiff. To constitute indirect evidence, a statement need not

"express[] [ ] bias on [its] face," but "[d]iscrimination [may] instead be inferred from the statement based on what was said and the surrounding circumstances." Conn, 149 F. Supp. 3d at 146–47.  Although the purported statement by Ryan that "[y]ou all look alike" does not definitively warrant a finding of racial bias, viewing this comment in the light most favorable to the plaintiff, and in light of the circumstances in which she alleges it was made, see Said Dep. 87:15–21, 94:1–3 (asserting that it was made after Ryan "confronted" her in his office because he "had assumed that [she] was not at [her] post, and he wanted to . . . discipline [her,]" "but it [was not her] that . . . was [not] at [her] post"), the Court finds that a reasonable jury could interpret the comment as reflecting a racially distorted image of the appearance of all African American women, see Gaddy v. Phila. Hous. Auth., Civ. Action No. 06-4570 (TRR), 2008 WL 2928485, at *5–6 (E.D. Pa. July 28, 2008) (concluding that a reasonable jury could conclude that an African American plaintiff's supervisor acted with discriminatory intent, in part because the supervisor's comment to the plaintiff that "you all look alike" was made after the supervisor had accused the plaintiff of being discourteous on the job and the plaintiff informed the supervisor that she had not been working when the alleged incident occurred).  In other words, the Court "cannot conclude with confidence at this stage that no reasonable juror could accept [the plaintiff]'s interpretation" of the alleged disparaging remark.  Uzoukwu v. Metro. Wash. COG, 130 F. Supp. 3d 403, 414 (D.D.C. 2015).

The defendant raises a number of challenges to the plaintiff's testimony regarding Ryan's alleged comment, none of which is persuasive.  First, the defendant argues that "aside from [the p]laintiff's self-serving testimony, there is no evidence that [Ryan] ever made such a comment."  Def.'s Mem. at 10.  However, this argument fails in light of this Circuit's agreement with the Third Circuit that "there is no rule of law that the testimony of a discrimination plaintiff,

standing alone, can never make out a case of discrimination that could withstand a summary judgment motion." George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005) (quoting Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990)). Additionally, the defendant asserts that the "[p]laintiff admits that she did not complain to Amtrak about the purported comment[,] and the co-worker and supervisor who [the p]laintiff claims [were] present when [ ] Ryan allegedly made the comment deny any recollection of it." Def.'s Mem. at 10. However, this argument also fails because such attempts to undermine the plaintiff's credibility or the weight her testimony is entitled to receive are inappropriate factors for the Court to consider at the summary judgment stage. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").[10]

The defendant next argues that even if Ryan made the comment, it is insufficient to establish discrimination because "the undisputed evidence demonstrates that [Ryan] was not a decision[]maker with respect to her termination," Def.'s Mem. at 10; see also Def.'s Reply at 11–12, given that "Baylor [ ] made the decision to terminate [the p]laintiff's employment," Def.'s Reply at 12, by "instructi[ng] . . . Ryan [to] prepare[]" the Rule 24 notification letter that was sent to the plaintiff, Def.'s Facts ¶ 47. Additionally, the defendant argues that Ryan's comment lacks probative value because "it was remote in time from [the plaintiff's] termination, was completely unrelated to [her termination], and [the p]laintiff does not allege that any

---

[10] The Court notes that contrary to the defendant's position, the plaintiff's testimony is not necessarily contradicted by her "co-worker and supervisor . . . [, who] deny any recollection of" Ryan's comment, Def.'s Mem. at 10, because the plaintiff testified that her supervisor, McClinton, left Ryan's office before Ryan allegedly made the comment, see Said Dep. 90:5–10, and her co-worker, Lockhart, only stated that he largely does not remember the events of that day, see Pl.'s Opp'n, Ex. M (Affidavit of Lee Lockhart (Sept. 28, 2013)) (stating that he "vaguely remember[s] the crew base asking [him] if [the plaintiff] was at her post," and that he told the crew base "to the best of [his] memory [ ] [the plaintiff] was doing her job," but that he "do[es] not remember anything else from that day besides smoking a cigarette with [the plaintiff] in front of the crew base").

discriminatory conduct or comments took place in the interim." Def.'s Mem. at 10 (internal citations omitted).

It is well established that "an isolated race-based remark unrelated to the relevant employment decision [does not], without more, permit a jury to infer discrimination." Morris v. McCarthy, 825 F.3d 658, 669 (D.C. Cir. 2016) (internal citation omitted). Therefore, to establish discrimination based on a "stray workplace remark," a plaintiff must generally show "a clear nexus between the . . . remark[] and the [termination,] . . . [which] can be shown if the remark was made by an individual with the power to influence [the p]laintiff's termination[] and . . . was temporally close in time to the termination." Ajisefinni v. KPMG LLP, 17 F. Supp. 3d 28, 44 (D.D.C. 2014) (fourth alteration in original) (citation omitted). However, the Supreme Court and this Circuit have "caution[ed] lower courts against discounting discriminatory statements 'not made in the direct context' of the challenged employment action," Morris, 825 F.3d at 670 (quoting Reeves, 530 U.S. at 152–53), or "made significantly before the relevant employment action," id. As this Circuit explained in Morris,

> [e]ven if such a statement carries less weight than one made at the time of the [adverse employment action], it is nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks. Instead of reviewing each racially charged remark individually and finding it insufficient, [courts must] consider it alongside any additional statements—and all other evidence—to determine whether a plaintiff has met her burden.

Id. (citation omitted).

First, the Court concludes that the facts in the record could lead a reasonable jury to conclude that Ryan had "the power to influence [the p]laintiff's termination." Ajisefinni, 17 F. Supp. 3d at 44. Even accepting as true that Baylor, not Ryan, made the decision to send the Rule 24 notification letter, a fact that the plaintiff has not directly disputed, see generally Pl.'s Opp'n, it is clear that Ryan actively participated in the termination process by preparing, signing, and

sending the defendant's Rule 24 correspondence, <u>see</u> Def.'s Facts ¶¶ 47–48, 52. Furthermore, after the Rule 24 notification letter was returned as undeliverable, it appears that Ryan took a number of steps on his own without any instruction from Baylor or anyone else, including contacting Bateman to identify the plaintiff's correct address, <u>see</u> Def.'s Facts ¶ 50 (asserting that "[a]fter [ ] Ryan's October 12, 2011 letter was returned to Amtrak undeliverable, <u>he</u> contacted [ ] Bateman to determine whether the [Union] had a different address for [the p]laintiff." (emphasis added)), and notably, preparing and sending the letter that ultimately terminated the plaintiff's employment, <u>see</u> <u>id.</u> ¶ 52 ("Because [the p]laintiff did not respond to the October 1[2], 2011 [ ] letter, [ ] <u>Ryan</u> followed up with a November 4, 2011 letter[.]" (emphasis added)). Although the defendant attempts to minimize Ryan's role in the plaintiff's termination by describing his "responsib[ility] for . . . issuing Rule 24 letters" as merely "administrative," <u>id.</u> ¶ 45, and asserting that Ryan "was not [the p]laintiff's day-to-day supervisor," <u>id.</u> ¶ 46, as the plaintiff notes, <u>see</u> Pl.'s Opp'n at 27, Ryan admitted in his DCOHR interview that "[p]er the union contract, [he] was [the plaintiff's] supervisor," Def.'s Mot., Att. (Waxman Decl.), Ex. C (Ryan Interview) at DCOHR000038. In light of all of these facts, a reasonable jury could conclude that Ryan had the power to influence the decisionmaking process regarding the plaintiff's termination. <u>See</u> <u>Threadgill v. Spellings</u>, 377 F. Supp. 2d 158, 165 (D.D.C. 2005) ("When one with a discriminatory animus participates in the decision making process together with others, the court cannot say conclusively that those others were completely insulated from []his influence." (citing <u>Griffin v. Wash. Convention Ctr.</u>, 142 F.3d 1308, 1311 (D.C. Cir. 1998)).

Second, the Court disagrees with the defendant that Ryan's alleged remark is too "remote in time from [the plaintiff's] termination" to be probative. Def.'s Mem. at 10. The plaintiff testified that Ryan's comment was made approximately two months before she began her leave

of absence on February 2, 2011, see Said Dep. 89:9–10, and therefore, was allegedly made approximately eleven months before her termination on November 4, 2011, see Def.'s Facts ¶ 52. Although eleven months is a significant period of time, this Circuit has instructed that "[e]ven if [ ] a statement [made significantly before the relevant employment action] carries less weight than one made at the time of the [action], it is nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff." Morris, 825 F.3d at 670 (considering racially charged remarks allegedly made by the plaintiff's supervisors as early as three years prior to the challenged suspension). Here, the plaintiff alleges that the remark was targeted directly at her. See Said Dep. 87:22–24 (asserting that Ryan "mentioned to [her] . . . I thought it was you, because you all look alike"). Additionally, contrary to the defendant's contention, see Def.'s Mem. at 10, the fact that there is no evidence in the record that Ryan made any other race-based comments to or about the plaintiff during the eleven months between Ryan's alleged remark and the plaintiff's termination is not particularly probative given that for nine of these months, the plaintiff was not at work and the record reflects that her contact with Ryan was limited to a single phone call in May 2011, see Said Dep. 85:10–15. Although evidence of additional race-based comments by Ryan would certainly bolster the plaintiff's showing of discriminatory intent, the Court cannot conclude that the absence of additional comments, especially under these circumstances, forecloses an inference of racial animus.[11]

---

[11] The defendant relies in part on the Circuit's decision in Hall v. Giant Food, 175 F.3d 1074 (D.C. Cir. 1999), for the proposition that Ryan's alleged remark cannot give rise to an inference of discrimination. See Def.'s Mem. at 9 (citing Hall, 175 F.3d at 1079–80). However, as the Circuit explained in Morris, the remark at issue in Hall was a "statement made after the challenged employment decision by [an] individual uninvolved in that decision," Morris, 825 F.3d at 670 (citing Hall, 175 F.3d at 1079–80), and therefore, is easily distinguishable from Ryan's alleged remark, which was allegedly made prior to the plaintiff's termination by an individual with the power to influence the termination. The defendant also relies on Garrett v. Lujan, 799 F. Supp. 198 (D.D.C. 1992), see Def.'s Mem. at 9 (citing Garrett, 799 F. Supp. at 200); however, that decision is also distinguishable for similar reasons, see Garrett,

(continued . . . )

In sum, the Court concludes that Ryan's alleged remark is evidence of Ryan's discriminatory intent that must be "consider[ed] alongside . . . all other evidence[] to determine whether [the] plaintiff has met her burden." Morris, 825 F.3d at 670 (citing Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998)). And, for the reasons explained in the following section of this memorandum opinion, the Court concludes that Ryan's alleged statement, combined with the plaintiff's evidence casting doubt on the defendant's proffered reasons for the plaintiff's termination, is sufficient to satisfy her burden necessary to avoid summary judgment.[12]

## 2. Evidence Challenging the Defendant's Proffered Reasons for the Plaintiff's Termination

"Proof that the defendant's explanation is unworthy of credence is [another] form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147. Indeed, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id.; see also St. Mary's Honor Ctr. v. Hicks, 590 U.S. 502, 517

---

( . . . continued)
799 F. Supp. at 200 (finding an alleged discriminatory comment "immaterial" because it was made by an employee "not involved in the employment decision-making process").

[12] The plaintiff also argues that "Ryan had a discriminatory animus against her[] [because] she kind of reminds him of a black woman who had a [child] with [his] son, . . . [who] was in prison for . . . killing his [child] with that black woman." Pl.'s Opp'n at 24. As support for her claim, she relies on Ryan's testimony confirming that his son is incarcerated for the murder of his child, whose mother is an African American woman, see Pl.'s Opp'n at 36; Ryan Dep. 32:21–34:2, and her assertion that "it was well-known at work[] that [ ] Ryan was very angry that his son was in jail for murder, and that he has said, [ ] but for that black woman[] [his] son 'mixed up with' he would not have been in jail," Pl.'s Opp'n at 24. However, as the defendant notes, see Def.'s Mem. at 11, the plaintiff admitted in her deposition that she did not hear Ryan make any statements about the events surrounding his son's incarceration, see Said Dep. 91:15–20, but that she only "heard indirectly from other coworkers talking . . . that [Ryan] was not too fond of African-American women," id. 91:2–7; see also id. 91:13–14 ("It was just the buzz that was going around."). Deposition testimony "based on second-hand information rather than personal knowledge, [ ] amount[s] to inadmissible hearsay and may not be considered in resolving a motion for summary judgment." Lemmons, 431 F. Supp. 2d at 90. Therefore, the plaintiff has failed to provide any evidence to demonstrate that Ryan harbors discriminatory animus against her because of the events surrounding his son's incarceration. See Bennett v. Solis, 729 F. Supp. 2d 54, 69 (D.D.C. 2010) ("[S]elf-serving statement[s] . . . without substantiation [ ] do[] not create an issue of material fact.").

(1993) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); <u>Aka</u>, 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

As previously indicated, the defendant asserts that

> [the p]laintiff was terminated pursuant to Rule 24 of the [Union's] CBA after failing to communicate with Amtrak during her extended leave of absence, failing to advise Amtrak of the reason she continued to be on leave or her expected return date, and failing to respond to correspondence from Amtrak regarding the same.

Def.'s Mem. at 6.  Rule 24 of the CBA, which governs "Unauthorized Absence," states that "[e]mployees who are absent from work for ten [ ] days without notifying [Amtrak] shall be considered as having resigned from the service, unless [Amtrak] is furnished satisfactory evidence that circumstances beyond their control prevented such notification."  Said Dep., Ex. 3 (CBA) at 30.

The plaintiff disputes each of the defendant's proffered reasons for her termination.  <u>See generally</u> Pl.'s Opp'n.  The defendant responds that the plaintiff has failed "to offer credible evidence that Amtrak's proffered reason for her termination was unworthy of credence . . . because she can offer nothing but her own self-serving speculation that anyone at Amtrak—let alone everyone at Amtrak—is lying."  Def.'s Reply at 10 (internal citations omitted).  For the reasons explained below, the Court concludes that the plaintiff has identified sufficient evidence to cast doubt on some of the defendant's proffered reasons.

### i. The Plaintiff's Alleged Failure to Communicate with the Defendant During Her "Extended Leave of Absence"

The plaintiff first disputes the defendant's assertion that she "fail[ed] to communicate with Amtrak during her extended leave of absence," Def.'s Mem. at 6, arguing that "she was in constant contact with" her managers and supervisors, Pl.'s Opp'n at 3.  Although it is not entirely

clear what time period the defendant considers to be the plaintiff's "extended leave of absence," the defendant appears to be referring to the period between April 2011 and February 2012, when the plaintiff attempted to return to work. See Def.'s Reply at 8 (asserting that the plaintiff "did not speak with anyone at Amtrak from April 2011 until January 2012," "except for bumping into [ ] Brewer in a grocery store"); see also id. at 1 (asserting that the plaintiff "did not contact Amtrak for [ten] months about her status"). The evidence before the Court, viewed in the light most favorable to the plaintiff, shows that during this time period, the plaintiff had at least three contacts with Amtrak employees. First, the plaintiff testified that she spoke with McClinton on the phone "sometime before early May 2011," when McClinton called her to "check[] to see how [she] was doing" and told her that "she[] [would] continue to put [her] on leave without pay." Said Dep. 85:16–20; see also Def.'s Facts ¶ 18 ("[The p]laintiff and [ ] McClinton spoke [ ] at some point in or around April 2011, at which time [ ] McClinton verbally extended [the p]laintiff's leave without a specific return date."). Second, the plaintiff testified that she spoke with Ryan on the phone sometime in May 2011, when he called her regarding a request for information he had received from her deceased husband's life insurance carrier. See id. 57:4–14; 85:10–15; see also Def.'s Facts ¶¶ 28–29 (acknowledging that Ryan "called [the p]laintiff on her phone" when he "received correspondence from [the p]laintiff's husband's insurance carrier," but asserting that the phone call occurred "[i]n [or] about April 2011"). And third, it is undisputed that the plaintiff spoke with Brewer in person at a grocery store in July 2011, when the two women unexpectedly encountered each other there. See Def.'s Facts ¶ 30; see also Pl.'s Opp'n at 18 (describing the encounter with Brewer as "a chance/unscheduled face-to-face meeting"). Although the Court is not convinced that a reasonable jury could find that the plaintiff's chance encounter with Brewer at the grocery store constitutes a "communicat[ion]

with Amtrak," Def.'s Mem. at 6, the facts show that her other contacts with McClinton and Ryan occurred when those employees were acting as representatives of Amtrak, see Def.'s Facts ¶ 18 (agreeing that during McClinton's phone call with the plaintiff in or around April 2011, McClinton "verbally extended the plaintiff's leave"); id. ¶ 29 (representing that Ryan's phone call to the plaintiff concerned her husband's life insurance carrier's "request[] that Amtrak verify certain information" and "Amtrak's response" to that request (emphases added)).  Therefore, although the plaintiff does not assert that she had any other specific contacts with the defendant's employees during this extended leave of absence period, see Said Dep. 86:4–12 (testifying that after her May 2011 phone call with McClinton, she did not speak with McClinton again until February 2012), a jury could reasonably conclude from these two contacts that the plaintiff did not "fail[] to communicate with Amtrak during her extended leave of absence," Def.'s Mem. at 6.

ii.      **The Plaintiff's Alleged Failure to Advise the Defendant of the Reason She Continued to Be on Leave or Her Expected Return Date**

As to the defendant's assertion that the plaintiff "fail[ed] to advise Amtrak of the reason she continued to be on leave," Def.'s Mem. at 6, which appears to refer to "the reason she needed to continue her leave beyond the initial bereavement period," Def.'s Reply at 8, the plaintiff argues that "Amtrak[] and its managers . . . knew everything about the reason behind [her] absence from work[] [and] her ill health, including surrounding circumstances and happenings," Pl.'s Opp'n at 18.  As support, she argues that "McClinton, . . . Brewer, . . . and . . . [another employee] signed and put into her personnel file[] three [ ] separate Leave of Absence[] [ ] form[s] on [her] behalf," and that she discussed her health issues with her supervisors, presumably referring to Brewer and McClinton, who consequently "gave her oral permission over the phone . . . to take all the time she needed to get well[] before returning to work."  Id. at

15; see also, e.g., id. at 20 (asserting that she "informed [ ] McClinton that she had been dropped from her husband's health insurance, and that she ha[d] no money to pay for her doctors' visits or to buy needed medication, and asked [ ] McClinton whether Amtrak would cover her"); Said Dep. 55:4–6 (testifying that "McClinton and [ ] Brewer said [to her] take all the time that [you] need to get well").[13]  The defendant responds that the plaintiff "never provided Amtrak with any doctor's note regarding her condition, nor did she tell anyone at Amtrak about the details of her medical condition," and "[s]he also never notified her [U]nion that she needed an extended medical leave of absence or requested [Family and Medical Leave Act] leave from Amtrak." Def.'s Reply at 18.

Viewing the evidence in the light most favorable to the plaintiff, the Court concludes that the plaintiff has identified evidence creating a genuine factual dispute as to whether she "fail[ed] to advise Amtrak of the reason she continued to be on leave."  Def.'s Mem. at 6.  First, the defendant admits that during the plaintiff's phone conversation with McClinton "in or around April 2011, . . . McClinton verbally extended [the plaintiff's] leave without a specific return date."  Def.'s Facts ¶ 18.  A reasonable jury could find this fact compelling, given that McClinton presumably would not have extended the plaintiff's leave of absence without a reason provided by the plaintiff.  Cf. Aka, 156 F.3d at 1292 ("Events have causes[.]").  Furthermore, the plaintiff testified that during a phone call with McClinton sometime before early May 2011, potentially the same phone call just referenced, the plaintiff  "told [McClinton that she] still wasn't doing well" and that her "body was deteriorating," to which McClinton responded that

---

[13] The plaintiff also argues that the defendant "had reason to know [of the reason for her extended leave] because she was collecting sickness benefits" from the Board, Pl.'s Opp'n at 19, and the Board "is obligated by an Act of Congress[] to inform the employer" of her sickness benefits, id. at 33.  However, even if the Board notified the defendant of the plaintiff's sickness benefits, that fact would not demonstrate that the plaintiff advised the defendant of the reason she continued to be on leave.  In any event, for the reasons explained infra, the Court finds that the plaintiff has identified other evidence sufficient to create a genuine dispute of material fact as to whether she advised the defendant of the reason she continued to be on leave.

she would "continue to put [the plaintiff] on leave without pay." Said Dep. 85:16–86:3. The plaintiff further testified that when she spoke with Ryan over the phone in early May 2011, "[h]e asked [her] how [she] was doing" and she "told him not that good," to which he responded, "take all the time you need to get well to return to work." Id. 57:10–14. Notably, the defendant does not appear to dispute the occurrence of these communications or their content. See generally Def.'s Mem.; Def.'s Reply. Based on these facts, a reasonable jury could conclude that, contrary to the defendant's position, the plaintiff did not "fail[] to advise Amtrak of the reason she continued to be on leave." Def.'s Mem. at 6.

In an apparent attempt to dispute that the plaintiff notified it of the reasons for her continued leave of absence, the defendant argues that "the fact that the CBA governing [the p]laintiff's employment prohibits any leave exceeding [ninety] days without joint agreement between Amtrak and the [U]nion (which indisputably did not occur here) undermines any argument by [the p]laintiff that she had permission for an unlimited leave," Def.'s Reply at 8–9, invoking Rule 22 of the CBA, see also Def.'s Facts ¶ 20 ("McClinton did not have authority to grant a leave of absence of more than [ninety] days." (citing, inter alia, Rule 22); see also Said Dep., Ex. 3 (CBA) at 28–29 ("Except for physical disability . . . , leaves of absence in excess of ninety [ ] days in any calendar year shall not be granted unless by agreement between . . . [Amtrak] and . . . the [Union].")). However, the significance of this argument is unclear to the Court, given that the defendant has not asserted that it terminated the plaintiff because she did not have "permission" to be on leave or, more specifically, because she violated Rule 22 of the CBA. Rather, it has admitted that "in or around April 2011, McClinton verbally extended [the p]laintiff's leave without a specific return date," Def.'s Facts ¶ 18, notwithstanding her alleged lack of authorization. Furthermore, in this litigation, it has explicitly invoked Rule 24, not Rule

22, as the reason for the plaintiff's termination, see Def.'s Mem. at 6 ("[The p]laintiff was terminated pursuant to Rule 24 of the [ ] CBA[.]"), and the Court is unaware of any evidence in the record demonstrating that at any point prior to this litigation, the defendant invoked lack of authorization or violation of Rule 22 as a justification for the plaintiff's termination. Therefore, for these reasons the Court concludes that this argument has no bearing on its summary judgment analysis of whether the plaintiff has identified sufficient evidence to cast doubt on the defendant's proffered reasons for the plaintiff's termination. See Chudson v. Watt, 125 F. Supp. 3d 255, 269 (D.D.C. 2015) ("The relevant question [for the Court] is whether the employer's actual reason was legitimate and non[]discriminatory—not whether the employer can articulate a 'post-hoc rationale' that would have been legitimate and non[]discriminatory." (emphasis added) (quoting Newsom v. Barnhart, 116 F. App'x 429, 434 (4th Cir. 2004)).

However, the Court cannot conclude that the plaintiff has successfully disputed that she "fail[ed] to advise Amtrak of . . . her expected return date." Def.'s Mem. at 6. Although the plaintiff purports to dispute this assertion, see, e.g., Pl.'s Opp'n at 4, she has not produced any evidence to demonstrate that she notified the defendant of her expected return-to-work date or that the defendant was otherwise aware of it. As the defendant points out, see Def.'s Mem. at 17, although the plaintiff testified in her deposition that her doctor estimated that she would be able to return to work on February 19, 2012, see Said Dep. 144:22–24, she also testified that she did not notify the defendant of that return-to-work date until she reported to work on February 7, 2012, id. 143:19–144:10; see also Def.'s Facts ¶ 38 (asserting that the plaintiff did not "provide any information about an expected return to work date until approximately three months after her termination" (emphasis removed)). And, although the plaintiff testified that her return-to-work date appeared on a doctor's slip she submitted to the Board in connection with her sickness

benefits claim, see Said Dep. 137:11–25 (testifying that a document introduced during the plaintiff's deposition as Exhibit 21 was a "doctor's slip" that reflected a return-to-work date of February 19, 2012); id. 140:8–12 (testifying that she provided Exhibit 21 to the Board), she testified that she never provided this document to the defendant, id. 140:19–21, and the plaintiff's broad claim that the Board must "give a railroad employer notice whenever an application for [benefits] is made," Pl.'s Opp'n at 33, even if true, is plainly insufficient to establish that the Board specifically notified the defendant of the plaintiff's expected return-to-work date or provided the defendant with documentation of the date.

### iii.    The Application by the Defendant of Rule 24 to the Plaintiff

The plaintiff also disputes that her conduct violated Rule 24 of the CBA.  Specifically, she argues that "Rule 24 is predicated on [an] employer's lack of knowledge of an employee's whereabouts," Pl.'s Opp'n at 18, and "[b]ecause [the d]efendant knew that [she] was absent from work due to illness, . . . Rule 24 was not available to [it] and [its] use of [the Rule] to terminate [the p]laintiff[] was [ ] pretext," id. at 19.  The defendant argues that "nothing in Rule 24 limits its use to cases where Amtrak has no information about the reason for an employee's absence," Def.'s Reply at 9, and nothing in the record demonstrates "the circumstances under w[hich] [ ] [R]ule [24] is normally invoked," id. at 7.  The defendant further argues that "it is neither [the p]laintiff's nor the Court's role to question how Amtrak and the [Union] interpret Rule 24 or the circumstances under which Amtrak customarily invokes it, so long as there is no evidence of discriminatory application, as is the case here."  Id.  Although the defendant is correct that the plaintiff has not introduced any evidence of the circumstances under which Amtrak typically invokes Rule 24, the plaintiff's position that Rule 24 was inapplicable to her situation finds some support in the plain language of Rule 24, which purports to apply where an "[e]mployee [ ] [is] absent from work for ten [ ] days without notifying the corporation."  Said Dep., Ex. 3 (CBA) at

33

30 (emphasis added).[14]  Therefore, the Court finds that because a reasonable jury could conclude that the plaintiff notified the defendant of her absence and the reasons for it, see supra Part III.B.2.ii, it could also conclude that the plaintiff's conduct did not violate the letter of Rule 24, which in turn could lead the jury to be "quite suspicious" of the defendant's Rule 24 justification. Morris, 825 F.3d at 671 (quoting Evans v. Sebelius, 716 F.3d 617, 622 (D.C. Cir. 2013)); see also id. at 671–72 (where the defendant's asserted justification for the plaintiff's suspension was that she violated an order of her superior, reversing the district court's grant of summary judgment for the defendant in part because a reasonable jury could conclude that the plaintiff's conduct did not violate the letter of that order).

The decisions the defendant cites for the proposition that it is not "the Court's role to question how Amtrak . . . interpret[s] Rule 24," Def.'s Reply at 7 (first citing Dudley v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 141, 169 (D.D.C. 2013); then citing Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)), are distinguishable.  Although both courts in Barbour and Dudley declined to question an employer's reliance on the plaintiff's noncompliance with a rule or policy to justify the challenged adverse employment action, there are two significant differences between those cases and this one.  First, in both cases, it was undisputed that the employee had not complied with the rule or policy in question, see Barbour, 181 F.3d at 1344 (where an employee challenged the employer's invocation of a rule requiring that employees seeking a promotion undergo a desk audit to justify the plaintiff's nonpromotion,

---

[14] The plaintiff also argues that "Rule 24[,] by its terms, makes termination voluntary," and therefore does not apply to the plaintiff's situation. Pl.'s Opp'n at 14.  She further argues that the "[d]efendant's own 'Separation Checklist for Cheryl Said,' [which] continuously classified her termination as 'Involuntary Separation,'" "contradict[s]" Rule 24. Id. at 15.  However, the plaintiff's interpretation of Rule 24 is not supported by its text, which states that "[e]mployees who are absent from work for ten [ ] days without notifying the corporation shall be considered as having resigned from the service," Said Dep., Ex. 3 (CBA) at 30 (emphasis added), and contrary to the plaintiff's position, does not purport to apply only when an employee voluntarily resigns.

the court noted that the plaintiff had refused a desk audit, while the employee to whom she compared herself as the basis for her discrimination claim received a promotion only after completing a desk audit); Dudley, 924 F. Supp. 2d at 151 (where an employee challenged the employer's invocation of an attendance policy to justify suspending the employee, the court noted that the employee "conceded that []he showed up late ten times and violated [the employer]'s policy").  Here, as explained above, the plaintiff has raised a genuine factual dispute regarding whether her conduct violated the terms of Rule 24.  Second, in both Barbour and Dudley, the courts determined that the plaintiffs had failed to provide sufficient evidence of the employer's discriminatory intent.  See Barbour, 181 F.3d at 1344, 1347 (rejecting the plaintiff's claim that her nonpromotion based on her failure to comply with a desk audit rule was racially discriminatory, because the "sole affirmative evidence of [her employer's racial] bias [wa]s [an] apples-and-oranges comparison she dr[e]w between herself and" a white employee, whose "promotion [concededly] followed a desk audit"); Dudley, 924 F. Supp. 2d at 159–60 (rejecting the plaintiff's claim that his suspension based on noncompliance with his employer's attendance policy was racially discriminatory, because he failed to demonstrate that the defendant had "enforced its policy in a discriminatory manner" or that his employer was "so racist and hostile towards [him] that any explanation [it] provide[d] for [his] suspension would be 'unworthy of credence'").  By contrast, the plaintiff in this case has proffered at least some evidence of discriminatory intent in the form of Ryan's alleged remark, see supra Part III.B.1, as well as evidence calling into question the defendant's proffered reasons for her alleged discrimination. Therefore, Barbour and Dudley do not support the defendant's position that its application of Rule 24 to the plaintiff cannot be questioned.

### iv. The Plaintiff's Failure to Respond to the Defendant's Rule 24 Correspondence

Finally, although it is undisputed that the plaintiff did not respond to the defendant's Rule 24 correspondence, see, e.g., Pl.'s Opp'n at 32 (acknowledging that "both letters [were] returned undelivered [to the d]efendant"), the plaintiff appears to assert that certain circumstances surrounding the Rule 24 correspondence demonstrate that this proffered reason is pretext. First, the plaintiff argues that the defendant "intentionally sent her notice and termination letters via FedEx to her old address[,] because it was part of [its] scheme[] to insure that she d[id] not find out [about her termination i]n time[] to challenge her managers," Pl.'s Opp'n at 3, when it "knew, ha[d] reason to know, or should have known . . . her [correct] address," id. at 15. Furthermore, she argues that pretext is demonstrated by the fact that the defendant "sen[t] mail for a second time to the same address, when the first mail had come back undelivered," and the "[d]efendant and its managers and supervisors and Human Resources office, who had her telephone number in their 'system' – the same number [ ] Ryan called her on[] in April[] 2011 . . . , did not use the phone and call [the plaintiff]." Id. at 32.

The Court concludes that the vast majority of the plaintiff's evidence fails to demonstrate that Ryan or anyone else involved in her termination knew or should have known her correct address. Although the plaintiff testified that "Ryan had [her] address on the letter from the [life] insurance company that was sent to [her] home," Said Dep. 114:24–25, the plaintiff has failed to produce any evidence to demonstrate that Ryan received such a letter.[15] Furthermore, although the plaintiff testified that McClinton and other employees knew her correct address, see, e.g.,

---

[15] The plaintiff has not attached to her Complaint or opposition any letters from Security Mutual Life sent to Ryan that reflect her correct address. The only letter from Security Mutual Life she has produced is a letter from that company that was sent to her, which does indeed reflect her correct address, but does not indicate that the letter was ever sent to Ryan or seen by him. See Compl., Ex. D (Letter from Pat Bush, Advanced Life Claims Examiner, Security Mutual Life, to Cheryl R. Said (May 26, 2011)).

Pl.'s Opp'n at 22 (asserting that she "g[a]ve [her] address to [ ] McClinton" and thereafter "receive[d] a condolence card from [ ] McClinton at her new address"); Said Dep. 116:13 ("Everybody knew where I lived."), she does not claim that any of these people informed Ryan or anyone else who was involved in her termination of the new address, see generally Pl.'s Opp'n; Said Dep. Nor does she claim that Baylor, Brewer, or Bateman, the individuals who were copied on the defendant's Rule 24 correspondence, see Def.'s Facts ¶¶ 48, 52, had knowledge of her new address. Indeed, she admits that "she did not inform [her] Union" of her new address. Said Dep. 101:18–20.

Moreover, as the defendant notes, the plaintiff has not shown that there is reason to believe that her address was ever updated in the defendant's records. See Def.'s Mem. at 8 ("[N]either Amtrak nor the [ ] Union had any [ ] address [other than her old address] on file for her[.]"). She has not provided sufficient evidence to dispute Ryan's deposition testimony that the plaintiff's address on record when the Rule 24 correspondence was sent was her District of Columbia address, see Def.'s Facts ¶ 47 (asserting that in preparing the Rule 24 notification letter, "Ryan . . . us[ed] the address on file in Amtrak's [ ] database . . . [and] also contacted Amtrak's Human Resources Department to confirm [the p]laintiff's address"),[16] or the defendant's internal records supporting its assertion that the plaintiff's address was never updated in the defendant's files, see, e.g., Said Dep., Ex. 13 (the defendant's record of the plaintiff's February 9, 2012 phone call with an Amtrak Human Resources representative,

---

[16] The plaintiff has generally argued that during his deposition testimony, Ryan "obfuscated and told outright lies and contradicted himself many times," Pl.'s Opp'n at 26, for example, by "deny[ing] any kind [of] supervisory responsibility over [the p]laintiff," id. at 27, and "cook[ing] up a fantastic and totally untrue and different story from what actually happened" in 2010 when he allegedly made a discriminatory remark to the plaintiff, id. at 25. However, the plaintiff has given the Court no reason to question the accuracy of Ryan's testimony regarding the absence of her new address in the defendant's files, and in any event, as already explained, the Court may not resolve issues of credibility at the summary judgment stage. See Anderson, 477 U.S. at 255.

reflecting that the representative "advised [the plaintiff that her] address in [the defendant's] system ha[d] not been change[d]").[17] Additionally, the plaintiff's testimony that she informed various employees of her new address does not establish that any of those employees updated her address in the defendant's records. See, e.g., Pl.'s Opp'n at 22 (asserting that she "g[a]ve [her] address to [ ] McClinton" and thereafter "receive[d] a condolence card from [ ] McClinton at her new address"); Said Dep. 107:25–108:19 (asserting that she notified an employee named Cassandra at the "crew base" of her new address). And, evidence in the record regarding her attempts to update her address with the defendant does not establish that those attempts were ultimately successful, see Said Dep. 113:17–25 (asserting that she faxed her new address to the defendant's Wilmington, Delaware office "about a week after . . . [she] moved" but that she was uncertain as to whether she received a fax receipt confirmation); see also id. 115:12–15 (testifying that she could not remember whether she received or returned a change-of-address form sent to her by Amtrak in April 2011), particularly in light of the defendant's assertion that it "has no record of a fax from [the p]laintiff in or around February 2011[,] regarding a change of address," Def.'s Facts ¶ 26, and that it "has no record of [the p]laintiff returning the change-of-address form . . . sent to her in April 2011," id. ¶ 27.

However, the Court cannot entirely dismiss the plaintiff's argument that pretext is to some extent demonstrated by the circumstances surrounding the defendant's Rule 24 correspondence. First, the plaintiff has provided some, albeit very little, evidence that Ryan knew her correct address at the time he sent her Rule 24 correspondence, in the form of her

---

[17] Although a number of the records identified by the defendant as evidence that the plaintiff's address was never updated in the defendant's files appear to have been printed nearly a year after the Rule 24 correspondence was sent, see, e.g., Said Dep., Ex. 13 (record of the plaintiff's February 9, 2012 phone call with an Amtrak Human Resources representative printed by the defendant on July 31, 2013), the plaintiff has not submitted any evidence to suggest that her address was ever updated in the defendant's files at any point prior to the date that these records were generated. Therefore, the Court finds that these records support the defendant's position that the plaintiff's address was never updated in the defendant's files.

testimony that "Ryan knew about [her] new address because [during their] call[] . . . [in the] first part of May [2011]," Said Dep. 124:23–24, "[she] told him [she] had moved," id. 125:7–8. Second, it is undisputed that approximately six months later, when the Rule 24 notification letter was returned as undeliverable, "Ryan . . . did not use the phone and call [the plaintiff]." Pl.'s Opp'n at 32. Although the defendant argues that "Ryan did not attempt to contact [the p]laintiff by telephone[] because it is Amtrak's policy to send Rule 24 communications exclusively in writing, so as to have a clear record of the same," Def.'s Facts ¶ 51 (citing Ryan Dep. 53:20–56:4), and that "[i]t is not the Court's role to assess whether Amtrak's procedures were optimal, but [only] whether its actions were motivated by discrimination," Def.'s Mem. at 7 (citing Dudley, 924 F. Supp. 2d at 169), "the plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case," Aka, 156 F.3d at 1291. And it is undisputed that in or around May 2011, just six months before he sent the Rule 24 notification letter, Ryan "called [the p]laintiff on her phone (the number of which did not change when she moved)" and spoke to her regarding her life insurance claim. Def.'s Facts ¶ 29. Therefore, although the record demonstrates that Ryan did make some effort to investigate the plaintiff's correct address after the Rule 24 notification letter was returned as undeliverable, see id. ¶ 50 (asserting that Ryan "contacted [ ] Bateman to determine whether the [Union] had a different address for [the p]laintiff"), it is clear that Ryan knew of another way to contact the plaintiff, but failed to use it. The Court concludes that a reasonable jury could be "quite suspicious" of this omission in light of the other evidence proffered by the plaintiff, including the plaintiff's testimony that Ryan knew she had moved, as well as other evidence undermining some of the defendant's proffered reasons for her termination and the plaintiff's testimony regarding Ryan's allegedly racially discriminatory remark. See Morris, 825 F.3d at 672 (concluding that a plaintiff

cast doubt on the defendant's explanation for her suspension in part because her supervisor provided "unpersuasive explanations for [her] failure" to reply to a memorandum accusing the plaintiff of unprofessional conduct).

In sum, the plaintiff has identified facts in the record sufficient to cast doubt on two of the defendant's proffered reasons for her termination—that the plaintiff failed to communicate with the defendant during her extended leave of absence and failed to notify the defendant of the reason for her extended leave of absence, see Def.'s Mem. at 6—and to make a reasonable jury "quite suspicious" of the defendant's application of Rule 24 to the plaintiff and the circumstances surrounding the defendant's Rule 24 correspondence, see Morris, 825 F.3d at 671. The Court acknowledges that the plaintiff has not cast doubt on all of the defendant's proffered reasons for her termination, specifically, that the plaintiff did not communicate her expected return-to-work date to the defendant and did not respond to the defendant's Rule 24 correspondence, and that in the absence of any other evidence of discrimination, this might mean that the plaintiff's evidence attacking the legitimacy of the proffered reasons would fall short. See, e.g., Barbour, 181 F.3d at 1347–48 (concluding that evidence that "calls into doubt only part of the [defendant]'s proffered explanation" was not sufficient to demonstrate pretext in light of the plaintiff's "inability to adduce any other evidence"). However, given the plaintiff's testimony that Ryan made a racially discriminatory statement to her of the type that this Circuit has warned district courts not to ignore, see Morris, 825 F.3d at 670, the Court concludes that all of this evidence, taken together, is sufficient to allow the plaintiff to survive summary judgment, see id. at 672 (concluding that the plaintiff's evidence undermining the defendant's proffered explanation for the plaintiff's suspension combined with evidence of her supervisor's "disparaging comments about white employees, including one statement about [the plaintiff]," could lead a reasonable "jury [to] find

that the plaintiff's insubordination charge was pretext for racial discrimination"); see also Aka,

156 F.3d at 1290 ("The court must consider all the evidence in its full context in deciding

whether the plaintiff has met its burden of showing that a reasonable jury could conclude that

[s]he had suffered discrimination[.]").  Therefore, the Court will deny summary judgment to the

defendant as to the plaintiff's section 1981 claim.[18]

## C.     The Plaintiff's DCHRA Claims[19]

### 1.     Statute of Limitations

The defendant argues that "[a]lthough the DCOHR accepted [the p]laintiff's [c]harge [of

discrimination], it should have been dismissed as time-barred because the only thing [the

p]laintiff submitted to the DCOHR within the one-year statute of limitations was an Intake

Questionnaire," and the "content of the Intake Questionnaire . . . does not satisfy the Supreme

Court's test for when filing a document short of a [c]harge tolls the statute of limitations."  Def.'s

Mem. at 14 n.3 (citing Fed. Express Corp. v. Holowecki, 552 U.S. 389, 400–03 (2008)).

However, this argument is misplaced.

In order for DCHRA claims to be timely, a plaintiff need only file a "complaint" with the

---

[18] The plaintiff also asserts that she "can establish proof of disparate treatment[] because she is the only black employee at Amtrak[] who [ ] Ryan has addressed the way he has."  Pl.'s Opp'n at 30.  Although a plaintiff may "support an inference that the employer's stated reasons were pretextual, and [that] the real reasons were prohibited discrimination . . . , [by citing] the employer's better treatment of similarly situated employees outside the plaintiff's protected group," Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015), here, the "[p]laintiff fails to specifically identify even one . . . []other employee to whom [she] was similarly situated," and "[w]ithout even the identification of an alleged comparator, the Court cannot determine that [the p]laintiff's employment situation [was] nearly identical to any other employee's," Smith v. Jackson, 539 F. Supp. 2d 116, 137 (D.D.C. 2008) (rejecting as insufficient the plaintiff's argument that "he was the only employee that [his supervisor] mistreated, and that he ha[d] therefore shown per se that he was treated differently than other similarly situated employees" (citation and internal quotation marks omitted)).  And, as the defendant notes, the "[p]laintiff concede[d] [in her deposition] that she is not aware of any . . . Caucasian employees who were treated more favorably by Amtrak than she was."  Def.'s Mem. at 13 (emphasis removed).  Therefore, the plaintiff's argument fails.

[19] The plaintiff's Complaint also references the Americans with Disabilities Act ("ADA") in the context of her wrongful discharge claim, see Compl. ¶ 66 ("[The p]laintiff believes she was wrongfully discharged in violation of public policy under the ADA, Fifth Amendment, and D[.]C[.] Human Rights."), but the plaintiff conceded in her opposition that she "did not make [a]n ADA claim," Pl.'s Opp'n at 43.  Consequently, the Court need not consider an ADA claim.

DCOHR "within [one] year of the occurrence of the unlawful discriminatory practice, or the discovery thereof." D.C. Code § 2-1403.04(a). And, a DCOHR intake questionnaire constitutes a "complaint" within the meaning of the DCHRA. See File a Discrimination Complaint, DCOHR, https://ohr.dc.gov/service/file-discrimination-complaint (last visited June 27, 2018) (instructing that "[t]o file a complaint with the [DCOHR]," a person must "simply complete an intake questionnaire and submit it to [the DCOHR]"); see also Leftwich v. Gallaudet Univ., 878 F. Supp. 2d 81, 93 (D.D.C. 2012) (concluding that the "[p]laintiff [had] filed a complaint with the [DCOHR]," and citing an exhibit purporting to be a DCOHR "Employment Intake Questionnaire").[20] And courts only require a plaintiff to have filed a "charge" or its equivalent within the statutory period when the relevant statute explicitly invokes that term. See, e.g., Holowecki, 552 U.S. at 393 (analyzing whether an EEOC intake questionnaire constituted "a charge alleging unlawful discrimination" under the Age Discrimination in Employment Act, which is a "phrase . . . used in the statute" (quoting 29 U.S.C. § 626(d) (2004)). Therefore, the Court concludes that the plaintiff's DCOHR claims are timely.

## 2. The Plaintiff's Race and Gender Discrimination Claims

The defendant further argues that the Court should grant it summary judgment as to the plaintiff's race and discrimination claims under the DCHRA for the same reasons it asserted regarding the plaintiff's § 1981 claim. See Def.'s Mem. at 15 ("[The p]laintiff's race and gender claims under the DCHRA fail . . . [because] Amtrak has articulated a legitimate business reason for terminating [the p]laintiff's employment and she can offer no evidence to demonstrate that

---

[20] The Court may take judicial notice of information on official public websites of government agencies. See Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("[C]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."); see also Fed. R. Evid. 201(d) (providing that "a court may take judicial notice at any stage of the proceeding").

Amtrak's reason was pretext for race discrimination."). The defendant is correct that in the absence of direct evidence of discrimination, the same McDonnell Douglas burden-shifting framework applies in evaluating discrimination claims under the DCHRA. See, e.g., Mitchell v. Nat'l R.R. Passenger Corp., 407 F. Supp. 2d 213, 226 (D.D.C. 2005) ("Discrimination claims brought under . . . § 1981[ ] . . . and the DCHRA are governed by the [McDonnell Douglas] burden shifting framework[.]"). However, contrary to the defendant's position, because the Court has concluded that the plaintiff satisfied her burden under that framework as to her § 1981 race discrimination claim, it must also conclude that she has satisfied her burden as to her race discrimination claim under the DCHRA. See id. at 247 (concluding that "because the plaintiff ha[d] presented enough evidence to create a genuine issue of material fact with respect to her claim[] of race . . . discrimination . . . [under § 1981], she also has presented enough evidence to withstand summary judgment with respect to her claim[] of race . . . discrimination . . . under the DCHRA").

The Court also concludes that the same evidence relied upon by the plaintiff to establish her race discrimination claims also supports, even though less convincingly, her gender discrimination claim under the DCHRA. As to Ryan's alleged remark, "you all look alike," Said Dep. 87:23–24, which the plaintiff asserts was "directed toward[] [her and] black [ ] women," id. 93:7–8 (emphasis added), given the "difficulties inherent in parsing out [employment discrimination] claims brought by individuals, [such as] African American women, who fall under more than one protected class," Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 336 (4th Cir. 2010), the Court "cannot conclude . . . at this stage that no reasonable juror could accept [the plaintiff]'s interpretation" of the remark, Uzoukwu, 130 F. Supp. 3d at 414. Furthermore, the Court finds that this alleged comment, combined with the plaintiff's evidence casting doubt

on some of the defendant's proffered reasons for her termination, could lead a reasonable jury to conclude that the defendant's proffered reasons were pretext for gender discrimination. Therefore, the Court concludes that it must deny summary judgment to the defendant on both the race and gender discrimination claims asserted by the plaintiff under the DCHRA.

###    3.    The Plaintiff's Disability Discrimination Claim

The defendant argues that the plaintiff's disability discrimination claim under the DCHRA must fail because the plaintiff cannot establish a prima facie case of disability discrimination, see Def.'s Mem. at 15–17, and "cannot establish pretext for the same reasons that she is unable to do so with respect to her race and gender discrimination claims," id. at 17. Like the plaintiff's race and gender discrimination claims, her disability discrimination claim must be analyzed under the McDonnell Douglas burden-shifting framework. See Giles v. Transit Emps. Fed. Credit Union, 794 F.3d 1, 5 (D.C. Cir. 2015) (alteration in original) ("[W]here the plaintiff lacks direct evidence of discrimination, . . . DCHRA[ ] [disability discrimination] . . . claims are [ ] evaluated under the familiar [McDonnell Douglas] framework[.]"). Pursuant to that framework, because the defendant has proffered legitimate nondiscriminatory reasons for the plaintiff's termination, the Court must consider "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the [defendant]'s asserted nondiscriminatory reason was not the actual reason [for the plaintiff's termination] and that the [defendant] intentionally discriminated against the plaintiff on . . . [the] basis [of her disability]," see id. at 6 (quoting Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008)), which, as already explained, includes evidence "showing either 'that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence,'"

Oviedo, 299 F. Supp. 3d at 60 (quoting Tex. Dep't of Cmty. Affairs, 450 U.S. at 256).  For the reasons explained below, the Court concludes that the plaintiff has failed to satisfy her burden.[21]

The defendant argues that the plaintiff has failed to establish a prima facie case of disability discrimination for two reasons.  First, although the defendant does not dispute the plaintiff's allegations that she "had a disability [because] she suffered from [h]ypertension, [i]nsomnia, and [d]epression among other ills," Pl.'s Opp'n at 40, it argues that the "[p]laintiff can offer no proof that Amtrak or [ ] Baylor . . . knew [that the p]laintiff was disabled or perceived her as being disabled," Def.'s Mem. at 16.  Second, it argues that the plaintiff cannot "establish that she was able to perform the essential functions of her position with or without reasonable accommodation."  Id. at 16–17.  However, as the defendant acknowledges elsewhere in its brief, see id. at 5, "once the employer asserts a legitimate, non[]discriminatory reason [for its challenged action], the question whether the employee actually made out a prima facie case is no longer relevant and thus disappear[s] and drops out of the picture," Giles, 794 F.3d at 6 (quoting Brady, 520 F.3d at 493).  Therefore, the Court need not determine whether the plaintiff has established a prima facie case of disability discrimination.

Nonetheless, the Court finds it appropriate to consider the defendant's argument that it lacked knowledge of the plaintiff's alleged disability.  Whether an employer knew about an employee's disability is a "threshold question[]" with respect to the issue of disability discrimination vel non, Conn, 149 F. Supp. 3d at 147, as "an employer cannot fire an employee because of a disability unless it knows of the disability," id. at 149 (emphasis added) (quoting

---

[21] To evaluate the plaintiff's DCHRA disability discrimination claim, the Court considered decisions interpreting the ADA, which are "persuasive" in the DCHRA context, Giles, 794 F.3d at 5 (quoting Grant v. May Dep't Stores Co., 786 A.2d 580, 583–84 (D.C. 2001)), as well as decisions interpreting the Rehabilitation Act, a statute the District of Columbia Court of Appeals has recognized is "analogous" to the DCHRA, Jaiyeola v. District of Columbia, 40 A.3d 356, 368 (D.C. 2012).

Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 932 (7th Cir. 1995)); see also Crandall v. Paralyzed Veterans of Am., 146 F.3d 894, 898 (D.C. Cir. 1998) (in a Rehabilitation Act case, concluding that "[i]f [a plaintiff's] behavior is not so obviously [a] manifestation[ ] of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability, and the employer has no other notice of the disability, there can be no actionable discrimination" (third and fourth alterations in original) (internal citation and quotation marks omitted)); Hunt v. District of Columbia, 66 A.3d 987, 991 (D.C. 2013) (recognizing that "an employer's duty . . . under the DCHRA[] [is] to make reasonable accommodation to the known physical or mental limitations of [a disabled] . . . employee" (second omission and third alteration in original) (emphasis added) (internal quotation marks omitted)). "To establish the employer's knowledge of [an employee's] disability, 'notice . . . need not be precise, but it must put the employer sufficiently on notice of the existence and nature of the disability.'" Green v. Am. Univ., 647 F. Supp. 2d 21, 33 (D.D.C. 2009) (Walton, J.) (quoting Evans v. Davis Mem'l Goodwill Indus., 133 F. Supp. 2d 24, 28 (D.D.C. 2000)).

Here, the plaintiff argues that the defendant "knew [ ] and had reason to know" that "[i]t was [the p]laintiff's disability that took her out of work for about a year . . . because she was collecting sickness benefit[s] from the [Board] and the [Board] gave [the defendant] notice of that as [it] was required to do under the law." Pl.'s Opp'n at 41. She further argues that "Brewer[] knew that [she] was . . . ill[] and that she was on sickness benefit." Id. However, even assuming that the defendant knew that the plaintiff had not reported to work because she was "ill" and collecting "sickness benefit[s]" from the Board, such knowledge is not sufficient to demonstrate that the defendant was "on notice of the existence and nature of [her] disability." Green, 647 F. Supp. 2d at 33 (quoting Evans, 133 F. Supp. 2d at 28). The plaintiff testified in

her deposition that although she informed McClinton, Brewer, and Ryan that she was ill and did not feel well, she did not inform the defendant or any of its employees of her diagnosis or any details regarding her illness, see Said Dep. 145:3–10 ("Q: Did you speak to anyone at Amtrak about your disability? A: Not as far as the actual[] diagnosis, no, . . . but they knew that I was sick, that I had a[n] illness."); see also id. 150:19–25 ("Q: . . . Did you discuss your medical symptoms with [ ] McClinton? A: No. I just [ ] t[old] her . . . that I wasn't feeling well.  My body [wa]s deteriorating.  I [wa]s just mentally going through so much.").  Moreover, the plaintiff does not argue or allege the existence of any facts to support the position that her "behavior [wa]s so obviously [a] manifestation[ ] of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," Crandall, 146 F.3d at 898, as general illness does not necessarily imply the plaintiff's alleged disabilities of "[h]ypertension, [i]nsomnia, and [d]epression," Pl.'s Opp'n at 40.

Furthermore, even if the defendant knew that the plaintiff was receiving sickness benefits, that knowledge would only necessarily put the defendant on notice that the plaintiff had demonstrated to the Board that she suffered from any one of a number of conditions, see 45 U.S.C. § 351(k) (2012) (providing that "sickness benefits" are available to railroad employees who are unable to work due to "any physical, mental, psychological, or nervous injury, illness, sickness, or disease, . . . [or] pregnancy, miscarriage, or the birth of a child" (emphasis added)), which do not necessarily qualify as a "disability" within the meaning of the DCHRA, see D.C. Code § 2-401.02(5A) (defining "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment").  Additionally, although the plaintiff asserts that she submitted documents indicating her diagnosis to the Board, she has

not asserted that she provided these documents to the defendant, nor established that the Board did so or was required to do so.  See Pl.'s Opp'n at 33 (only broadly claiming that the Board must "give a railroad employer notice whenever an application for [benefits] is made"); see also 45 U.S.C. § 355(b) (only requiring that the Board "provide notice of [ ] claim[s for benefits] to the claimant's [ ] employer").[22]  Therefore, for all of these reasons, the plaintiff has failed to establish that the defendant was on notice that she suffered from a disability under the DCHRA.

The defendant also argues that the plaintiff "cannot establish pretext . . . [because s]he simply has no evidence of discriminatory animus other than her own rank conjecture, w[hich] is patently insufficient to meet her burden."  Def.'s Mem. at 17.  The Court agrees that the plaintiff has not proffered sufficient evidence to establish that the defendant's proffered reasons for her termination are pretext for disability discrimination.  As already discussed at length, although the plaintiff has provided evidence that some of the defendant's proffered reasons are pretext, unlike in the context of her race and gender discrimination claims, she has not proffered any discriminatory statements or other evidence that could give rise to an inference of discrimination on the basis of her purported disability.  See Giles, 794 F.3d at 6 (explaining that "the plaintiff [must] produce[] sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis" (emphasis added) (quoting Adeyemi, 525 F.3d at 1226)).  And, although this Circuit has rejected a requirement that "employment discrimination plaintiffs [ ] be routinely required to submit evidence over and above rebutting the

---

[22] Indeed, as the defendant notes, see Def.'s Reply at 13–14, the regulations implementing the Railroad Unemployment Insurance Act prohibit the Board from providing access to a claimant's medical records except pursuant to "special procedures" that the plaintiff has not alleged were followed here, see 20 C.F.R. § 200.5(e) (2018).

employer's stated explanation in order to avoid summary judgment," it has simultaneously recognized that "a plaintiff who creates a genuine issue of material fact as to whether the employer has given the real reason for its employment decision will [not] always be deemed to have presented enough evidence to survive summary judgment." Aka, 156 F.3d at 1290 (emphasis removed); see also Giles, 794 F.3d at 9 ("[T]here are 'instances where, although the plaintiff has . . . set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'" (quoting Reeves, 530 U.S. at 148)). The Court concludes that is the result here.

In sum, although the plaintiff has provided sufficient evidence for a reasonable jury to find that some of the defendant's proffered reasons for her termination "w[ere] not the actual reason[s]" for her termination, Adeyemi, 525 F.3d at 1226, the plaintiff has not provided sufficient evidence to demonstrate that the defendant had notice of her alleged disabilities or "intentionally discriminated against her on" the basis of her disability, id. Therefore, the Court will grant summary judgment to the defendant on the plaintiff's disability discrimination claim under the DCHRA.

**D.       The Plaintiff's Due Process Claims**

In response to the plaintiff's claim that the defendant "violated her due process rights under the [Fifth Amendment to the United States] Constitution" when it "took away her property interest in her job," Compl. ¶ 64, the defendant argues that the "[p]laintiff cannot demonstrate either a procedural or substantive Due Process violation," because, inter alia, the plaintiff has not "identif[ied] the source of [her alleged] property interest." Def.'s Mem. at 22. As the defendant notes, see Def.'s Reply at 23, the plaintiff's only response to this argument is that she "ma[d]e[] a legitimate due process argument[] and has provided probative evidence [ ] that [ ] [the

d]efendant intentionally planned and orchestrated her termination in a manner that was deliberately intended to ensure that she had no opportunity to defend herself, or to go through the CBA process with her [U]nion." Pl.'s Opp'n at 43.

The Due Process Clause of the Fifth Amendment provides that "no person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In assessing the plaintiff's due process claim, the Court notes as an initial matter that the plaintiff does not specify whether she is asserting a procedural or substantive due process claim, or both. However, even assuming that she is asserting both types of due process claims, the Court agrees with the defendant that both lack merit.

To establish a Fifth Amendment procedural due process claim "based on termination from employment, . . . a plaintiff must demonstrate that [s]he has a 'property interest in continued employment.'" Dave v. D.C. Metro. Police Dep't, 905 F. Supp. 2d 1, 8 (D.D.C. 2012) (quoting Orange v. District of Columbia, 59 F.3d 1267, 1274 (D.C. Cir. 1995)). And, "[t]o determine whether [one] ha[s] a property interest in continued employment, [the Court must] ask if [s]he ha[s] a legitimate expectation, based on rules (statutes or regulations) or understandings (contracts, expressed or implied), that [s]he would continue in [her] job." Int'l Union, United Gov't Sec. Officers of Am. v. Clark, 706 F. Supp. 2d 59, 66 (D.D.C. 2010) (second, third, and seventh alterations in original) (quoting Hall v. Ford, 856 F.2d 255, 265 (D.C. Cir. 1988)); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) ("Property interests [cognizable for a procedural due process claim] are not created by the Constitution[;] 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." (citation omitted)). Although "[p]rivate employment contracts," such as collective bargaining agreements, "may create a property interest entitled to

due process protection," Int'l Union, 706 F. Supp. 2d at 65, the plaintiff has failed to identify any

provision in the CBA or any other "law[s], rules[,] or understandings that support h[er] claims to

continued employment," Dave, 905 F. Supp. 2d at 10.  Therefore, she has "failed to prove

that . . . [s]he had any legitimate expectation of continued employment," and consequently, her

procedural due process claim fails.  Id. at 8; see also Muwekma Ohlone Tribe v. Salazar, 813 F.

Supp. 2d 170, 196 (D.D.C. 2011) (Walton, J.) (granting summary judgment to the defendant on

the plaintiff's procedural due process claim because the plaintiff failed to meet its "burden of

proving the existence of a constitutionally protected property interest").

  To assert a substantive due process violation, a plaintiff must demonstrate that she was

arbitrarily deprived of a fundamental right, liberty, or property interest that is based in the United

States Constitution.  See Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 229 (1985)

("While property interests are protected by procedural due process even though the interest is

derived from state law rather than the Constitution, substantive due process rights are created

only by the Constitution." (internal citation omitted)).  For several reasons, this claim also fails.

First, "there is substantial doubt as to whether one's interest in public employment is protected

by substantive due process."  Winder v. Erste, 511 F. Supp. 2d 160, 183 (D.D.C. 2007)

(collecting cases and concluding in dicta that "employment interests are not protected by

substantive due process"), aff'd in part, rev'd and remanded in part on other grounds, 566 F.3d

209 (D.C. Cir. 2009); see also Am. Fed'n of Gov't Emps., Local 2741 v. District of Columbia,

689 F. Supp. 2d 30, 36 (D.D.C. 2009) ("[I]n substantive due process cases[,] . . . courts have

consistently held that 'there is no fundamental right to government employment.'" (omission in

original) (quoting McManus v. District of Columbia, 530 F. Supp. 2d 46, 71 (D.D.C. 2007)).

Even assuming for the sake of argument that such an interest is protected by substantive due

process, the plaintiff has failed to demonstrate that the defendant's conduct satisfies the stringent "conscience-shocking" test necessary to support a substantive due process violation, which requires a plaintiff to show that the government's conduct is "so egregious [and] so outrageous[] that it may fairly be said to shock the contemporary conscience." Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). More specifically, "a plaintiff must show 'grave unfairness' by [government] officials," either by showing "a substantial infringement of the law prompted by personal or group animus, or [ ] a deliberate flouting of the law that trammels significant personal or property rights." Crockett v. D.C. Metro. Police Dep't, 293 F. Supp. 2d 63, 69 (D.D.C. 2003) (quoting Tri Cty. Indus., Inc. v. District of Columbia, 104 F.3d 455, 459 (D.C. Cir. 1997)). Here, the plaintiff's assertion that the "[d]efendant intentionally planned and orchestrated her termination in a manner that was deliberately intended to ensure that she had no opportunity to defend herself, or to go through the CBA process with her [U]nion," Pl.'s Opp'n at 43, while troubling if true, is simply not sufficient to satisfy "the exceedingly high standard required to show a substantive due process violation," Anderson v. Ramsey, No. 04-cv-56(GK), 2006 WL 1030155, at *10 (D.D.C. Apr. 19, 2006) (rejecting the plaintiff's argument that his supervisor "acted from personal motives" in taking disciplinary action against him, explaining that "however questionable [the supervisor]'s actions may have been[,] . . . the record is simply insufficient to establish that he exercised his powers arbitrarily, or that he deliberately flouted the law"). Therefore, the Court concludes that it must grant summary judgment to the defendant on the plaintiff's due process claims.[23]

---

[23] The defendant also argues that any due process claim must fail because the "[p]laintiff offers no basis for application of the Fifth Amendment to Amtrak," Def.'s Mem. at 22, and that the plaintiff's procedural due process claim must fail because the plaintiff "eventually receive[d] notice" of her termination, id., and "could have

(continued . . . )

**E.      The Plaintiff's Wrongful Discharge in Violation of District of Columbia Public Policy, Fraudulent Misrepresentation, and Negligent Misrepresentation Claims**

Finally, the defendant argues that the plaintiff's claims for wrongful discharge in violation of District of Columbia public policy, fraudulent misrepresentation, and negligent misrepresentation are barred by the applicable statutes of limitations, and therefore, the Court should grant summary judgment to the defendant as to these claims. <u>See</u> Def.'s Mem. at 23–24. The defendant is correct that these claims are subject to a three-year statute of limitations under District of Columbia law. <u>See</u> <u>Drake v. McNair</u>, 993 A.2d 607, 617 (D.C. 2010) ("The statutory limitation period governing [a plaintiff]'s fraud and [negligent] misrepresentation claims is three years." (citing D.C. Code § 12-301(7), (8) (2001)); <u>Stephenson v. Am. Dental Ass'n</u>, 789 A.2d 1248, 1249 (D.C. 2002) ("There is no dispute that [a wrongful termination] claim, based on public policy, is governed by the three-year statute of limitations set forth in D.C. Code § 12–301(8) (2001)."). And, this "statute of limitations begins to run when a plaintiff has either actual or inquiry notice of (1) the existence of the alleged injury, (2) its cause in fact, and (3) some evidence of wrongdoing." <u>Drake</u>, 993 A.2d at 617. Here, the plaintiff testified that she learned of her termination, the injury for which she seeks relief in this case, on February 7, 2012. Said Dep. 61:2–3. In light of this testimony, and the defendant's concession that the statute of limitations did not begin running until February 7, 2012, <u>see</u> Def.'s Mem. at 23, the Court concludes that the plaintiff was required to initiate her wrongful discharge and fraudulent and negligent misrepresentation claims on or before February 7, 2015. However, she did not file her

---

( . . . continued)
attempted to, but did not, institute a formal grievance process," <u>id.</u> at 22–23. However, because the Court concludes that it must grant the defendant summary judgment on the plaintiff's due process claims on other grounds, the Court need not address these arguments.

Complaint until August 11, 2015, see Compl. at 1, nearly six months after the statutory limitations period expired.

The plaintiff argues that the defendant should be "estopped from claiming that [she] brought her action untimely because it intentionally and actively ensured that she not find out []timely so as to have the opportunity to know what ha[d] been done to her and appropriately defend herself." Pl.'s Opp'n at 44. Although the doctrine of equitable estoppel may be used to toll a statute of limitations in situations where "the defendant takes active steps to prevent the plaintiff from suing in time," Gonzalez v. Internacional de Elevadores S.A., 891 A.2d 227, 241 (D.C. 2006) (citation omitted), for example, by taking "affirmative acts . . . to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action," Chappelle's Estate v. Sanders, 442 A.2d 157, 158 (D.C. 1982), the plaintiff has offered no explanation for how the defendant's actions prevented her from suing within the statutory limitations period. To the extent that she intends to rely on her position, asserted with respect to her discrimination claims, that the defendant "intentionally sent her notice and termination letters via FedEx to her old address because it was part of their scheme[] to [e]nsure that she d[id] not find out on time, to challenge her managers," Pl.'s Opp'n at 3, this position cannot support a claim to equitably toll the statutory limitations period given that the accrual date of February 7, 2012, already takes into account the fact that the plaintiff did not learn of her termination until several months after the Rule 24 termination letter was mailed to her.

The plaintiff further argues that as a result of the defendant's actions, she "could not have brought her action prior to when she did, before trying to exhaust [her] administrative remedies open to her, even at that late time that she found out she was terminated," id. at 44; however, she again has failed to offer any explanation for this position. As the Court explained in its prior

opinion in this case, the plaintiff "had the right" to file a grievance on her own behalf but "opted not to," Said v. Nat'l R.R. Passenger Corp., 183 F. Supp. 3d 71, 77 (D.D.C. 2016) (citation omitted); see also Said Dep. 66:14–21 (admitting that she did not pursue a formal grievance), and the record demonstrates that after the plaintiff contacted her Union representative and learned shortly thereafter that the Union would not represent her, see Said Dep. 62:16–63:14, she did not take any further steps to pursue her administrative remedies. Therefore, the plaintiff's need to "exhaust [her] administrative remedies" before filing suit, Pl.'s Opp'n at 44, cannot explain her delay in initiating this case. Accordingly, because the plaintiff's wrongful discharge in violation of public policy, fraudulent misrepresentation, and negligent misrepresentation claims are time-barred and she has failed to provide any basis for equitably tolling the applicable statute of limitations, the Court must grant summary judgment to the defendant as to these three claims.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff has produced sufficient evidence for a reasonable jury to find in her favor on her race discrimination claim under 42 U.S.C. § 1981 (Count II) and her race and gender discrimination claims under the DCHRA (Count III), and therefore, summary judgment in favor of the defendant as to those claims is denied. However, the Court concludes that the plaintiff has failed to produce sufficient evidence to support her disability discrimination claim under the DCHRA (Count III) and her due process claims (Count IV), and therefore, the defendant is awarded summary judgment as to those claims. Finally, the Court concludes that it must also grant summary judgment to the defendant on the plaintiff's claims of race and gender discrimination under Title VII (Count I), wrongful

discharge in violation of public policy (Count IV), fraudulent misrepresentation (Count V), and

negligent misrepresentation (Count VI) because those claims are also time-barred.

   **SO ORDERED** this 10th day of July, 2018.[24]

REGGIE B. WALTON
United States District Judge

---

[24] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.